## Baker v. Commonwealth.

(Decided October 13, 1925.)

### Appeal from Jefferson Circuit Court (Criminal Division).

1. Criminal Law—Admission in Rebuttal of Material Substantive Evidence Admissible in Chief Generally Abuse of Discretion.— While lower court has reasonable discretion in regulating introduction of proof, it is generally abuse of discretion and reversible error to permit introduction in rebuttal of material substantive evidence admissible in chief.

2. Criminal Law—Officer's Testimony as to Defendant's Statements after Shooting Held Admissible in Rebuttal, Though Indicative of Malice and Motive.—When accused relied on insanity as defense, and claimed that he did not remember how his meeting with deceased terminated or what occurred thereafter, officer's testimony that defendant told him that he kept pulling pistol after shooting deceased the first time and did what he intended to do was admissible in rebuttal, though it also indicated malice and motive.

3. Criminal Law—Deceased's Mother's Testimony as to Occurrences, Concerning which Defendant Testified, Held Admissible in Re-

buttal, Though Indicative of Motive and Malice.—In trial for wife murder, where defendant testified as to various matters occurring between him, deceased, and her mother at latter's residence, mother's testimony in rebuttal as to transactions occurring at her house, showing deceased's fear of defendant and quarrels and threats by him, was admissible, though also indicative of motive and malice.

4. Criminal Law—Reading Confession to Defendant as Witness in Jury's Hearing, Without Preliminary Proof of Execution, Held Error.—It was error to permit Commonwealth's attorney to read to defendant in jury's hearing, on cross-examination, a written statement in nature of confession made out of court, after defendant had failed to identify his signature thereto, without preliminary proof of its execution.

5. Criminal Law—Permitting Commonwealth's Attorney to Read Confession, Made Out of Court Without Preliminary Proof of Execution, Held Not Prejudicial Error.—Permitting Commonwealth's Attorney to read to defendant, on cross-examination, statement in nature of confession made out of court, after defendant had failed to identify his signature thereto, without preliminary proof of its execution, held not prejudicial error; paper being competent to rebut defendant's insanity plea, where shown to have been voluntarily made, without coercion or plying of questions.

6. Criminal Law—Failure to Limit Effect of Rebuttal Evidence to Contradiction of Defendant's Testimony and Impeachment of His Credibility Held Not Error.—Failure to admonish jury that statement in nature of confession read by Commonwealth's Attorney should be considered only for purpose of contradicting defendant and affecting his credibility as witness held not error; evidence having been introduced to rebut defense of insanity.

7. Homicide—Self-Defense Instruction Held Not Required in View of Defendant's Theory Covered by Instruction Given.—Where defendant did not claim that he thought it necessary to shoot deceased to protect himself, or that he pressed pistol in her direction for such purpose, but contended that he protected himself by twisting her wrist, and remembered no more, instruction that, if pistol was accidentally discharged in struggle with deceased for its possession, and defendant did not willfully and intentionally discharge weapon, and was not negligent in handling it, jury should acquit, covered defendant's theory, and self-defense instruction was not required.

8. Criminal Law—Question to Defendant as to Charge on which Formerly Convicted Held Not Reversible Error, in View of Ruling on Objection and Admonition to Jury.—Question to defendant in murder trial as to charge on which he had been convicted and served term in penitentiary of another state held not ground for reversal, where court sustained objection and admonished jury that they could consider evidence of former conviction only for purpose of affecting his credibility as witness.

9. Criminal Law—Commonwealth Attorney's Reiteration of Questions Ruled Incompetent by Court Held Improper and Deserving of Sharp Reprimand.—In trial for wife murder, question to deceased's mother by Commonwealth's attorney as to whether defendant told her that he shot his first wife held highly improper and deserving of sharp reprimand, as reiteration of questions as to charge on which defendant had been convicted and served term in another state, which court had ruled incompetent.

10. Criminal Law—Commonwealth Attorney's Reiteration of Questions Ruled Incompetent Held Not Reversible Error, in View of Ruling on Objection and Admonition to Jury.—Commonwealth attorney's question to deceased's mother as to whether defendant told her that he shot his first wife held not reversible error, though improper as reiterating questions, ruled incompetent by court, as to charge on which defendant had been convicted and served term in another state, where court promptly sustained objection and fully admonished jury in proper manner.

MATT J. HOLT and ROBERT HUBBARD for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Affirming.

In a trial in the Jefferson circuit court the defendant, John Baker, a colored man, was convicted of the murder of his wife, Maria Baker, and his punishment fixed at death.

The facts are: Defendant and deceased were married about three years before the tragedy. At the latter date he was 38 years of age, strong and robust. She was about 21 or 22 years of age, quite small and rather delicate. Most of their married life was spent in Louisville, though they were in Chicago for a time, returning to Louisville about a year before the homicide, and boarding with deceased's mother. Marital troubles arose and a separation ensued in March or April of 1924. In the month of June defendant went to Cincinnati and remained about two weeks. On his return he ascertained that his wife had filed suit for divorce. She was still living with her mother but was working as an elevator operator in a department store, and the parties do not seem to have met until the morning of July 10th. At that time defendant went to the store early in the morning, intoxicated and with a pistol in a holster; he remained in the vicinity until the store was opened, and shortly after the arrival of his wife entered the store and walked to the elevator;

he and his wife made two or three trips to the third floor and back, no one else being present. On the third trip she was shot five times, receiving a number of fatal wounds from which she died within a few minutes. The elevator was stopped about three feet from the third floor and defendant opened the door and climbed out on that floor with a smoking pistol in his hand; he met a department head, who told him to give him the pistol, which he did; this witness broke the pistol and removed the five empty shells; defendant demanded them and witness returned them to him, defendant putting them in his coat pocket; witness then suggested that they go back to the office and he would call the police for him to surrender, and defendant said he would, "because it was all over anyway." But instead of going to the office he walked to the stairway leading below. Two negro porters came running up the steps and in a manner not explained the three became involved in a fight and rolled to the basement, where they were joined by another employe of the store, who struck defendant over the head four or five times with a stair "banister." He escaped momentarily from his captors and ran across the street, but was followed and arrested. He was carried to the hospital, where his wounds were dressed, and later returned to the police station, where he signed a written statement concerning the difficulty. It was also shown that defendant had mistreated and neglected his wife and threatened her on different occasions.

On his own behalf defendant testified that he had always cared for his wife but that she had been untrue to him, and narrated several occasions on which he had discovered her having illicit relations with other men; that he had forgiven her upon her promise to refrain, but she had continued to err in this respect; also that on two occasions she had attempted to take his life for merely suggesting the proper conduct for her to pursue; these things had weighed upon his mind and, together with the separation, so troubled him that he was unable to control his feelings; that on the morning of the tragedy he went to the store to consult with his wife in reference to the divorce and the other men with whom she had been staying, and also as to their property, but he does not claim to have attempted to effect a reconciliation. He drank intoxicating liquor to drown his troubles, and had started to carry his pistol to a gunsmith to have the lock repaired. He did not know the name or address of the

gunsmith, except that he was told the location of the shop was somewhere on Market street and he did not go to that place. Upon entering the elevator he engaged in conversation with his wife about the above matters while the elevator was going up and down. She said "she would get a divorce when she would damn please and she would go with whom she damn pleased." "When she spit in my face I wiped my face that way. While I was doing that she jerked my revolver out of here. I caught her hand, and when I caught her hand and twisted it the revolver went off once or twice. Then I was insane positively. I did not know nothing what happened until these fellows started fighting me on the outside." He also contradicts the various threats alleged to have been made by him.

On cross-examination the Commonwealth presented the written statement mentioned above, this purporting to have been signed and sworn to by him, and to detail the encounter in the elevator in a way that contradicts his testimony in several particulars. He asserted that he was unable to identify it and had no memory of ever seeing it; but without any preliminary proof the Commonwealth was permitted to read in the presence of the jury so much of it as the court thought material, and defendant was asked whether or not he had signed it, to which he again returned the same answer above indicated.

A number of his friends testified as to peculiarities of conduct upon his part for several weeks prior to the homicide, and of their belief that he was not of sound mind at the time. Also a physician testified from a hypothetical question based upon the evidence that in his opinion the defendant was not of a sound mind at the time of the tragedy.

In rebuttal the Commonwealth introduced the officers who procured the defendant's statement and who testified that it was voluntarily made, signed and sworn to without any threats or promises of immunity or plying of questions, whereupon the court permitted the written statement to be read to the jury the second time. The court also permitted the policeman, Hugh Jones, who carried defendant to the hospital at the time of his arrest, to testify in rebuttal that on the way they were discussing the case and that defendant voluntarily told him, "After I shot her the first time I just kept pulling the pistol. . . . I done what I intended to do when she wouldn't come back to live with me." The mother of deceased,

Sudie Jones, colored, was permitted to testify as to various transactions occurring at her house between defendant and his wife to the effect that deceased was afraid of defendant and to narrate quarrels and threats upon his part.

(1) From the above summary of the proceedings in the trial it will be observed that the evidence of officer Hugh Jones as to defendant's statements to him while under arrest, and that of deceased's mother, Sudie Jones, as to defendant's statements and conduct toward his wife were substantive in character, and properly evidence in chief, and it is urged that it was error to admit such evidence in rebuttal. It is the general rule that, while the lower court has a reasonable discretion in regulating the introduction of proof, it is an abuse of discretion and reversible error to permit material, substantive evidence of this character to be introduced in rebuttal. Fletcher v. Commonwealth, 26 Rep. 1158; Williams v. Commonwealth, 90 Ky. 596; Abott v. Commonwealth, 23 Rep. 229; Truax v. Commonwealth, 149 Ky. 704; Collett v. Commonwealth, 121 S. W. 427. The statements of these witnesses indicated malice and supplied a motive for the killing, hence they were of the most damaging character and ordinarily would authorize a reversal, but it will be noted that accused relied on insanity as a defense and claimed that he could remember only a part of what occurred in the elevator, and did not remember how the meeting between him and his wife terminated or as to what occurred thereafter. The evidence of the officer tended to rebut that testimony and to show that he did know what he was doing at the time of the fatal encounter, and that he was not actuated by an insane impulse, hence it was both competent and admissible in rebuttal for that purpose. Defendant had also testified as to various matters occurring between himself, his wife and Sudie Jones at the latter's residence, and her evidence was introduced in explanation and rebuttal of his testimony. It is defendant's misfortune that this evidence also indicated motive and malice and that he was carrying out a clearly formed intention, but this does not render it inadmissible. It being admissible for the purpose named, there is no rule of law that would authorize its exclusion.

(2) Defendant strongly insists that the written statement is in the nature of a confession made out of court and that it was error for the court to permit the Common-

wealth's attorney to read the statement to the witness in the hearing of the jury, after he had failed to identify his signature thereto without preliminary proof of its execution. No doubt that the court was in error in so doing. Commonwealth v. McClanahan, 116 Ky. 416. But, as stated above in reference to the evidence of other witnesses, this paper was competent in rebuttal of defendant's insanity plea, and in its rebuttal evidence the Commonwealth introduced proof showing that it was voluntarily made, without coercion or plying of questions, hence it was properly admitted at that time, and on this view of the case we do not think the error of its prior introduction prejudicial.

(3) It is next urged that the court should have admonished the jury that the rebuttal evidence noticed above should be considered only for the purpose of contradicting the defendant and thereby affecting his credibility as a witness, if it did so, but for the reasons suggested this ground is untenable. The evidence was introduced to rebut the defense of insanity and not as a mere contradiction of the witness upon the principal charge.

(4) The only criticism of the instructions is that a self-defense instruction was not given. However, the court gave instructions upon voluntary and involuntary manslaughter arising from the careless use of a deadly weapon, and upon insanity as relied upon by defendant, and also in instruction No. 6 authorized an acquittal if the pistol was discharged accidentally and without negligence. It reads:

"If the jury believe from the evidence that the defendant, John Baker, did not offer to shoot the deceased, Marie Baker, at the time and place shown in the evidence, and that she grabbed the pistol which he had with him and that in the struggle for the possession of same between her and the defendant, the said pistol was accidentally discharged, and that said John Baker did not willfully and intentionally discharge said weapon and was not guilty of negligence in the handling of same, as set out in instructions Nos. 4 and 5, then the jury should find the defendant not guilty."

It seems to us that this covered defendant's theory. This case is not analogous to those where there are no eye-witnesses and nothing to negative self-defense, in

which we have held that the law of the case includes all the degrees of the crime of murder, and also an instruction upon self-defense. Here the defendant testifies as to how the struggle arose; he remembers the details of the occurrence up to the firing of the second shot; he does not claim that the deceased was armed, but asserts that she snatched his pistol from the holster and that he caught her wrist, twisted it and that the pistol fired twice before his memory lapsed. Perhaps it may be inferred that at the time she drew the pistol it was pointed at him and his life was in danger therefrom, but he does not claim or intimate that he thought it necessary to shoot her in order to protect himself, or that he pressed the pistol in her direction for that purpose. His contention is that he twisted her wrist and thus protected himself, and that he remembers no more. If under such circumstances the first shot took effect upon her person his defense would be fully covered by the sixth instruction. Considering the disparity of the size and strength of the parties after diverting the pistol from his direction there could have been no necessity of his shooting her in self-defense; and this instruction applies to subsequent shots, even though he does not remember what occurred, as they were fired after he secured possession of the pistol and at a time he was admittedly in no danger. This is borne out by the cross-examination thus: "Who had hold of the pistol?" A. "She, naturally, she taken it out of my pocket." Q. "Who had a hold of the pistol when the other shots were fired?" A. "I guess I must have had a hold of it; my intention was to take it away from her to keep her from shooting me, which I knew she would have shot, which she had done before." Q. "Who had a hold of the pistol then when it went off the other times, who pulled the trigger?" A. "I don't know, I can't remember a thing about it." Q. "But you do remember having hold of the pistol when it went off the other time?" A. "I taken it away from her, yes."

(5)   The fifth ground urged is misconduct of the counsel for the Commonwealth. The defendant admitted on cross-examination that he had been convicted and served a term in the Kansas penitentiary while he was married to his first wife, and after repeated questions was asked to name the charge on which he was convicted. The court sustained an objection to the question and admonished the jury that they were not trying him for what happened in Kansas and that they could consider the

evidence of his former conviction only for the purpose of affecting his credibility as a witness, if it did affect it.

In rebuttal for the Commonwealth Sudie Jones was permitted to tell of the relations between the accused and his wife, and of his wife's fear of him, and was asked this question, "To refresh your memory, did he or not tell you that he shot his first wife?" The court sustained an objection to the question and admonished the jury at length not to consider it. The conduct of the Commonwealth's attorney in thus attempting to get objectionable matter before the jury by reiterating the questions which the court had ruled to be incompetent was highly improper and merits a sharp reprimand, but in both instances the court promptly sustained an objection and fully admonished the jury in a proper manner, and it cannot be presumed that they disregarded his instructions.

Wherefore, perceiving no error, the judgment is affirmed.