# Evans v. Commonwealth.

(Decided May 31, 1929.)

(As Modified, on Denial of Rehearing, September 27, 1929.)

412

DAVIS & HARRISON and JAMES M. GILBERT for appellant.

J. W. CAMMACK, Attorney General, B. B. GOLDEN, J. G. ROLLINS and JAS. S. GOLDEN for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming.

About 10:30 p. m., on Saturday, October 16, 1926, Robert Woolum, chief of police of Pineville, Ky., was slain. William Evans was charged by indictment with his murder. Upon his trial under that indictment, he was found guilty of manslaughter and sentenced to 21 years in the penitentiary. He appealed his case to this court, and the judgment was reversed. The opinion delivered may be found in 221 Ky. 648, 299 S. W. 553. He was tried again on April 3, 1928, and again found guilty of manslaughter, and his punishment fixed at 21 years in the penitentiary. As the former opinion gives a statement of the facts, we shall not devote much of this opinion to that; but we want to correct one thing in the former opinion. That correction is that it is erroneously stated in that opinion that the pistol with which Chief Woolum

was killed was a .44 caliber; at other parts of the opinion it is referred to as a .45 caliber. We have carefully gone through the former record, and we find this should have been .45 caliber, and it is evident that the use of the expression .44 caliber was a mistake.

On the second trial, the commonwealth called five witnesses who had not testified on the former trial, and ten witnesses who had testified on the former trial were not called on this one. The defense called sixteen witnesses who were not called before, and failed to call ten witnesses upon whose evidence he had previously relied. Eighteen witnesses that testified for the commonwealth before testified this time, and sixteen witnesses that were used by the defendant before were used this time. Each side materially strengthened its case.

Chief Woolum was slain near the depot in Pineville. A number of people were in and about the depot at the time; yet the slayer escaped without any one being able to establish his identity. The great weight of the evidence is that the man who slew Woolum was a left-handed man and did this shooting with his left hand. There were three wounds on Woolum's body. One entered his left leg on the inside, just above the ankle, and passed out between the ankle and heel on the outside of his left foot. Another entered his body at the lower right-hand corner of his right vest pocket and passed out the upper edge of his left hip pocket. Another entered his body a little farther around to the right, and passed out at the waistband of his pants, just above his left hip. Woolum died almost instantly, without ever indicating who killed him. The commonwealth's evidence indicates that Woolum's slayer was dressed in a dark blue suit of clothes. There is some dispute in the evidence about what he had on his head.

Evans had recently come into possession of a .45 caliber automatic Colt's pistol No. 376281. Evans came to Pineville between 4 and 5 o'clock that evening and brought his pistol. He stopped at a restaurant operated by one Teasley. He bought from Teasley some candy which he left there, saying he would be back after it. At three different times this evening he bought from Teasley, so Teasley says, a gill of pear extract, a decoction which contains 50 per cent. alcohol by volume. Evans admits taking two drinks of this stuff. Some witnesses thought he was intoxicated; others thought not. He left his pistol with Teasley and went to Pineville, where he

got shaved and bought some Peters cartridges for his pistol. Then he and some others came back to Teasley's. Evans got his automatic, unloaded it and reloaded it. These parties then went up on the mountain and gambled for a while. Rain broke up the party, and they came back to Teasley's. There they separated. Two members of the poker party went home, and the other two arranged to meet Evans later, over in Pineville. This was about 8 o'clock. Evans claimed he stayed around there until about 30 minutes after the train came from Harlan. That train passed at 8:30, and Evans claims that he started home about 9 o'clock, and got home between 9 and 10 o'clock. When he got home, he unloaded his pistol and hung it up, then went to see his brother-in-law, aroused him, and talked to him for 15 or 20 minutes in the kitchen. There was no fire in there; his brother-in-law was in his night clothes; he soon got cold; they then went into the other room where there was a fire and talked for some minutes, and, after that, Evans went home and went to bed. He did not keep his engagement with his poker companions as he had promised, and he had also told Teasley that he would come back and spend the night with him, but he did not do that. Neither did he get the candy which he had bought and left at Teasley's.

He was seen at the Louisville & Nashville Depot about 10 o'clock or a little thereafter. He was cursing, displayed this .45 automatic pistol, said his name was Bill Evans, and these witnesses said that he stated he was in trouble and would just as soon kill a man as spit; but, this threat was not allowed to go to the jury. In view of the evidence of Goddard, this should have been admitted: it showed Evans' general malice, and this time there was evidence conducing to show that Evans slew Woolum. Evans had on a dark looking suit and a black hat. Evans was seen in Pineville that night between 9:30 and 10 o'clock. He had on a dark suit, black hat, and was drinking. He was going toward the Louisville & Nashville Depot. The witnesses whom he passed said he was muttering to himself and cursing; that he was alone. The porter in the Louisville & Nashville Depot saw him about 10 o'clock. He had on a black or blue suit and a black hat. A witness named Johnson saw Evans in Pineville between 3 and 4 o'clock this afternoon. He had on a blue suit and black hat. This witness saw Woolum about 10 o'clock that evening, and walked with

him a short distance down Kentucky avenue to the end of the bridge. This witness saw two men coming over the bridge toward Pineville as Woolum started over the bridge from Pineville to the depot. One of these men had a pistol in his left hand which he was dragging along a wire upon the bridge. Evans is a left-handed man. When Woolum got within 6 or 7 feet of these men, they turned back toward the depot. Another witness met Woolum and another man on this bridge. He recognized Woolum by his uniform, and he said the man with him had on a dark suit of clothes. They were walking fast and talking. They were about the same size. The proof shows Evans and Woolum were about the same size. As Woolum and this man came off the bridge next the depot, they turned to the left, walked about 50 or 60 feet down the river, and then engaged in a struggle in which the fellow in the dark clothes slew Woolum. A bullett was dug out of the earth where this killing occurred. Six shots were fired. Six shells were picked up at the scene of the shooting. This was evidently an automatic pistol, for the shells were ejected as the shots were fired. Two pistols were found on the dead man, neither of which had been taken out of its holster or fired.

This brings us to the evidence of the witness Calvin H. Goddard, and it is to his evidence that the defendant has devoted the larger part of his brief, and it is because this witness and his evidence seem to be the storm center, that we are going to treat it with some degree of elaboration.

In the case of Jack v. Com., 222 Ky. 546, 1 S. W. (2d) 961, we referred to an article on ballistics written by Major Goddard. The commonwealth acted promptly. Our opinion in this Jack case was published on March 1, 1928, and on April 4, 1928, Goddard appeared and offered to testify as a witness in this case. The defendant claims that he was taken by surprise by the introduction of this witness, and moved the court to set aside the swearing of the jury and continue the case. He relies on the case of Caldwell v. E. F. Spears & Sons, 186 Ky. 70, 216 S. W. 83. We have read that opinion very carefully, and it practically amounts to this, *that a litigant need never be surprised when his adversary proves his case.* We affirmed that judgment, and in that opinion we said: "The surprise contemplated by the Code is such as is not reasonably to be anticipated, or perhaps testimony contrary

to a prior understanding between the parties or something resulting from actual fraud or deception.''

We have examined the record of the first trial of this case, and we find in that trial an effort was then made to identify these shells and bullet picked up at the scene of the killing as having been fired from the pistol that was found in Evans' home, and which he admits was the pistol he had with him on the evening of the killing, so the defendant cannot claim to have been surprised by the efforts of the commonwealth to do this, since the commonwealth made the same effort on the first trial. From his brief and the motions made, it appears his surprise does not consist in the commonwealth's having endeavored to prove this, but consists in the commonwealth's having endeavored to prove this by Goddard. His surprise consists in this, that Goddard went about this in a manner different from the manner he had expected. Evans contends that, upon the call of this case for trial on March 29, 1928, he requested the attorneys representing the commonwealth to furnish him a list of the witnesses that would be called and introduced by the commonwealth, and that the attorneys promised him to do so. He says that again on April 3 he asked the commonwealth for the names of the witnesses that would be introduced, and that the commonwealth told him that he already had a correct list. He files affidavit of his counsel that they had no reason to suspect that Major Goddard would be called, that his name was not on the list, etc. There is filed the affidavit of James S. Golden, one of the attorneys, for the commonwealth, and he says that, when the list of witnesses was being called at the beginning of the trial, he called the name of the witness Goddard, that he called it slowly, and defendant had ample time to take down the name, and that in open court he did furnish to the defendant's attorney a list of the commonwealth's witnesses, including the name of Calvin Goddard; and he says in his affidavit that the defendant has wholly failed to furnish the commonwealth a list of the witnesses he expected to call.

Aside from Code section cited below, our attention is called to no provision of the Code or statutes of this state requiring the commonwealth to furnish to the defendant a list of the witnesses by which it expects to establish the defendant's guilt or requiring the defendant to furnish to the commonwealth a list of the witnesses by which he expects to prove his innocence. Oppos-

ing counsel may find it convenient to extend to each other such courtesies, and it seems from these affidavits they did have such an understanding, and the whole dispute is: Was this done? The affidavit of counsel for defendant is that it was not, and the affidavit of counsel for the commonwealth is that it was. The bill of exceptions is silent, and, in the absence of something concerning this in the bill of exceptions, we cannot consider it. We have often announced this rule, and in Hopkins v. Com., 210 Ky. 378, 275 S. W. 881, we gave the reasons that induced us to adopt it, and this dispute between opposing counsel illustrates the wisdom of the rule. "Unless it is required by statute, defendant is not entitled, as a matter of right, to be served with a notice or list of all the witnesses that will appear against him." See 16 C. J. 799, sec. 2030. By section 120 of our Criminal Code of Practice, the names of all the witnesses examined before the grand jury must be written at the foot of or on the indictment, but "we have repeatedly held that the rule requiring the names of witnesses examined before the grand jury to be entered on the indictment, does not prevent the commonwealth from introducing on the trial witnesses whose names are not on the indictment or in a subpoena for the commonwealth." See Porter v. Com., 145 Ky. 548, 140 S. W. 643.

We are not impressed by this contention, for the record shows the list of witnesses furnished Evans by the commonwealth did contain the name of J. P. Goddard, and not Calvin H. Goddard. There is no showing that the use of the initials "J. P." instead of "Calvin H." deceived or misled the defendant in any way. He knew the commonwealth would call a witness by the name of Goddard, and, in the absence of a showing that he had investigated and prepared to meet the evidence of J. P. Goddard, we are unable to see how he was prejudiced when it turned out that his name was "Calvin H." instead of "J. P." So the court did not err in permitting Goddard to testify, or in overruling defendant's motion to set aside the swearing of the jury and continue the case when Goddard was called.

This brings us to the consideration of his evidence, and counsel for the defendant, with commendable diligence and meticulous care, objected to each and every question asked him. The court overruled them all, and defendant excepted. To make a particular discussion of each individual question objected to, every ruling and ex-

ception, would extend this opinion to an unnecessary length, so we shall just consider them generally.

First, the defendant objected to questions asked Major Goddard concerning his education, profession, and experience, and we are willing to admit that this did go to rather unusual length, since about ten pages of the record are devoted to it. However, the defendant was not prejudiced by that, for, if Major Goddard had been excused after he had detailed his educational, professional, and military training and experience, the defendant would not have been hurt at all, but this was what hurt the defendant: Goddard was given the pistol which it was admitted in evidence belonged to the defendant. He was given seven cartridges which the defendant admitted were taken from his pistol. He was given six hulls or shells which witnesses testified were picked up at the place of the killing, and he was given a bullet which witnesses testified was dug out of the ground at the place of the killing. He was then excused and allowed to make a study of these. Then he was recalled and asked if he had made such investigation, and he said he had. He said that the pistol given him was a Colt's automatic pistol .45 caliber, serial No. 376281. He said that he was convinced that the bullet that had been introduced in evidence had been fired through this pistol 376281, and stated as his reasons therefor:

"I fired a test cartridge through this pistol after having examined the evidence bullet to determine if possible what company made that bullet, I brought with me sample unfired bullets made by the different American cartridge companies, I compared this fired evidence bullet with those unfired samples, and the evidence bullet matched the product of the Peters Cartridge Company. I therefore selected a cartridge of the same type having a 230 gr. metal jacket bullet, the evidence bullet being of the 230 gr. type; the cartridge I selected being a Peters make and fired this through the evidence pistol; before firing, the shell of this cartridge was marked by me in the presence of several witnesses 'T-1' to mean test No. 1; the bullet was fired into a basket filled with cotton-waste and recovered by me from that waste in the presence of the various witnesses and immediately marked on the base 'T-1.' The evidence bullet was now placed under one microscope of a double micro-

scope which I use known as a comparison microscope; the test bullet was now placed under the second microscope of this pair; this pair of microscopes has a cross arm which rests on top of them, in the middle of which is an eyepiece; this cross arm carries prisms; these prisms serve to throw the object of the two bullets under the two microscopes together, in the center of the cross arm; there is a second pair of prisms in the center of the cross arm which throws the picture forward; when you look in this eyepiece in the middle of the cross arm you see a single bullet, which is made up one-half of the bullett under one microscope the other half of the bullet under the other microscope; by moving the bullet around on the stage of the microscope and by rotating them around it is possible to bring these bullets together in such fashion that the picture which you see looks as though it was a single bullet and not two bullets put together. By keeping one bullet fixed, set, and rotating the other bullet they can be matched, by trying one bullet against the fixed portion of the other bullet, if these two bullets were fired through the same pistol they will match, that is through the same barrel; after you have tried all the way around that bullet you will find points left on these two bullets by the pistol barrel, fine lines left by the wearing of the tool will match across the dividing line. After we find such a point then we can move the bullets together all the way around and you will find more similar points all the way around both bullets. Unless they are through the same particular gun these vary, and the similarity ends; if through the same particular gun the distinguishing marks on 'both bullets correspond. This is the condition I found when I compared the evidence bullet with the test bullet which I fired from the evidence pistol. If they are through the same particular gun all of these fine marks, not all of them, but a great per cent. will match.''

He said he made these tests with this particular pistol and had made two additional tests with other pistols for the purpose of letting any one who wished examine the additional ones, and his examination showed them different from the bullet fired through the pistol in evidence. He said it only required one single test to

420

identify the bullet in evidence as having been fired through the Evans pistol. He said that the attorneys on both sides had requested him when he began this investigation to tell no one the result of it until he told it from the witness stand, and he had complied with their wishes. He then testified concerning his examination of the shells picked up at the scene of the killing as follows:

"I examined these shells and find that there were three .45 caliber automatic shells of Remington make, there was one of United States Government make, and two Peters make; one of these two had a shiny area, polish on the head of the shell right next to the primer, one of these two Peters shells, I noticed that particularly, because all of the Peters shells given to me as taken out of the magazine of this evidence pistol were polished in that same fashion, inasmuch as the evidence bullet matched the product of the Peters Cartridge Company, as I have already stated the test shells which I fired were Peters make, I fired three test cartridges of Peters make, one through the evidence pistol number 376-281, one through another similar pistol, number 15509 and one through my own pistol of the same type, number 70. The shells were marked 'T-1' 'T-2' and 'T-3' indicating tests 1, 2 and 3; I compared the shells recovered after test one with the two Peters shells in evidence, the two empty Peters shells in evidence. . . . I compared these shells through this microscope which I have described. I find that the impression left by the firing pin on these shells, on the test shells, was identical with the one left on the two empty Peters shells picked up at the scene. That impression has a peculiarity about it which is quite pronounced in that on the edge of the circular hole there is an additional little lip such as you see on the edge of an oil can, a little lip on the edge of the depression left by the firing pin; that lip is noticeable on the shell picked up and on the other shell which I fired in the evidence pistol. On the shells which I fired in the other two pistols the impression left by the firing pin is quite different, the depression, the hole made by the firing pin was different and the character of the hole was different from that presented on the evidence shells picked up at the scene. They in no way bore any degree of similarity at all."

He then testified that, when a pistol is fired, there is developed within the shell a pressure of approximately 1,500 pounds to the square inch, that it is this pressure which drives the bullet out of the barrel, and that the shell is driven back against the breech of the pistol with an equal force. He testified that all the little scratches, markings, and irregularities on the hard breech of the pistol are thereby stamped on the soft butt of the shell. He said that, in the making of the barrel of a pistol, after the hole had been drilled through the bar out of which the barrel is to be made, and the hole has been polished and finished, a rifle cutter is then passed through the barrel with a twisting motion so that it cuts and scrapes away a thin shaving of the metal as it goes, thus leaving in the barrel a series of twisted grooves which are known as rifles. The spaces between these grooves are called lands. He testified that, when the pistol is fired, these grooves and lands leave their marks upon the bullet, and that, owing to the constant and rapid wearing of the tools used in this rifling, the rifles of no two pistols are exactly alike, even though made by the same company by the same machine. He testified that these rifles and lands will leave their marks upon every bullet that is fired through the pistol barrel, and that all bullets through the same barrel will have the same markings, the same tiny scratches, the same width of lands between the scratches, and that those will not be the same as those made on bullets fired through another barrel of the same make. We see no reason to quote further from this evidence, except to say that Major Goddard was permitted to make tests with other pistols of the same make, and was given shells that had been fired from the defendant's pistol and from other pistols, and he was able to identify the pistols from which they had been fired by an examination of the shells; these shells having been previously marked for the purpose of testing his identification. On cross-examination, Major Goddard gave his address as No. 4 E. 28th street, New York City. He was asked to give the names of other experts along his particular line, and he gave the names of Capt. Edw. C. Crossman, Los Angeles, Cal., Merton O. Robinson, New Haven, Conn., Capt. Seth Wiard, Middleton, Conn., and Capt. Charles Van Amberg, Boston, Mass., as men who were well qualified to make examinations similar to the examinations made by him.

The members of the jury were allowed to look through the microscope at the bullets and shells. The defendant of course objected to this and to the time consumed by the jurors in making this examination. The defendant cites the cases of Ætna Life Ins. Co. v. Bethel, 140 Ky. 619, 131 S. W. 523, Ætna Life Ins. Co. v. Kaiser, 115 Ky. 539, 74 S. W. 203, 24 Ky. Law Rep. 2454, and Baker v. Com., 210 Ky. 524, 276 S. W. 550, and others, in support of his contention that an expert witness should not be allowed to invade the province of the jury and to state conclusions, but should confine himself to expression of his opinion and to the facts on which he based it. In the case of Kentucky Hydro-Electric Co. v. Reister et al., 216 Ky. 303, 287 S. W. 357, a similar contention was made. We said of those witnesses: "These men were not expert witnesses, but rather what is termed skilled witnesses."

Ordinarily a witness is said to testify as an expert when a state of facts, observed by some one else, is hypothetically submitted to the witness, and he is asked, in view of those facts, to state what his opinion is, whereas a man skilled in a particular business, who makes his own observations, and testifies to what he has observed and his conclusions therefrom, is regarded as a skilled witness. He occupies the same position as any other witness, except that it is recognized that within certain lines he possesses a superior knowledge which enables him to understand, as one without such special knowledge could not, what he has observed. Thus, in a litigation about a horse, an experienced horseman, who has seen and examined the horse, would be permitted to state whether he was a saddle horse or a draft horse; would be permitted to state the horse's age, weight, appearance, or, if he observed such facts, would be permitted to state if the horse was a crib-biter or a cryptorchid, etc. In like manner, a drover would be permitted to say of a bunch of cattle what they would weigh, what age cattle they were, and to say whether they were polled Angus, Herefords, Shorthorns, etc. A dog fancier of experience would be permitted to say whether a dog was a fox hound, a bird dog, or a poodle, etc. An experienced builder could say whether or not a house was well built, what it would cost, the value of the work, etc. An experienced engineer would be permitted to state the weight, power of an engine, and what caused a cylinder to break, etc. An experienced banker would be permitted to say

whether a document was genuine or forged; whether a figure had been changed or not, or an erasure made. A civil engineer of experience could say whether a dam was of sufficient strength to hold back a given body of water; could state the cause of the diversion of the waters of a stream; whether or not a fen could be drained, etc. See 22 C. J. 643, sec. 647 et seq., and notes following case of State v. Pruett (22 N. M. 223, 160 P. 362) L. R. A. 1918A, 656.

The statement made by this witness of which the defendant is complaining was this: "I am convinced as a result of this test that the bullet in evidence was fired through the pistol in evidence 376281." A reading of that answer shows the witness did not state that as a fact, but stated that, from his observation, he was convinced. In other words, he stated that as his opinion. In like manner, when testifying about the shells, he said: "I am satisfied they were fired through the pistol in evidence." He then proceeded to point out the marks and impressions made on them whereon he based his opinion, and explained that, when a soft copper shell is driven back against the hard steel breech of the pistol by the tremendous pressure generated when the cartridge is fired, all the marks, scratches, and irregularities of the breech are thereby imprinted on the shell. He stated the breeches of no two pistols were alike, and then proceeded to detail the method of their manufacture and to explain the reasons that the file marks and the marks made by the finishing tools were different in the cases of the different pistols. He was then permitted to make a detailed drawing on a blackboard illustrating these matters. To this the defendant objected, but we can see no good reason for his objection. No good reason could be given why a witness, when asked to state the shape of a piece of land, should not be permitted to take a pencil and draw an outline of the shape of it. He might find it very difficult to describe the shape of it, but could illustrate so that it could be clearly understood. That is all this witness did. The only difference was he used a piece of chalk and a blackboard instead of pencil and paper.

Sometimes witnesses must perforce give conclusions. For instance, in the case of King v. O. V. F. & M. Ins. Co., 212 Ky. 770, 280 S. W. 127, a witness said he could smell gasoline. The plaintiff objected to this as a conclusion of the witness and insisted the witness should have described the odor. We said that was technically correct,

but added that "the average man would have great difficulty in telling just how coal oil or gasoline smells, though acquainted with their odors," and that perhaps the best description the witness could give was to say he knew their odors and he could smell coal oil or could smell gasoline. Sometimes circumstances are such that a witness must needs give his conclusions. When that situation arises, the right of cross-examination is open to a litigant, and he can by the exercise of that right fully test the correctness of the witness' conclusion. For the discovery of truth and the establishment of justice, certain rules have been formulated governing the admissibility and competency of evidence. Those rules should usually be followed, but, when a rigid adherence to them would be subversive of the ends for which they were adopted, they should no longer be rigidly adhered to.

The defendant objected to the jury looking through these microscopes at these bullets and shells, but we cannot see any well-founded reason for that. Suppose the bullet had been handed to the jury for their examination, there would be no well-founded reason for objecting. Such has been done hundreds of times. Now suppose that one member of the jury had put on his spectacles in order he might see the bullet, no objection could be made to that; yet, when he looks through the microscope, the defendant objects. That is just the same as the use of the spectacles. It merely enabled the juror to see and to see better than he could see with his naked eye. So there is no well-founded reason for the defendant's objection.

This same witness, Goddard, testified in the case of Galenis v. State (Wis.) 223 N. W. 790. We have before us a printed abstract of that record and the briefs in that case. His testimony there is very similar to his testimony here, yet the Supreme Court of Wisconsin affirmed the judgment in that case and held this evidence competent. In like manner, we have before us the briefs in the case of State v. Boccadoro (N. J. Err. & App.) 144 A. 612. That judgment imposed a life sentence. This same witness testified in that case, and his evidence there appears to have been very similar to his evidence here. The New Jersey court affirmed that judgment, and in its opinion said: "Ballistic experts called by the state testified that, after a very careful examination of these two bullets, they were convinced that they had been fired from the same weapon."

In the case of Com. v. Sacco et al., 255 Mass. 369, 151 N. E. 839, a .32 caliber Colt automatic pistol and some cartridges therefor were found in the possession of Sacco. A .32 caliber bullet was taken from the body of Beradelli, the man who was slain. The commonwealth introduced two witnesses in that case, Charles H. Procter and Charles J. Van Amberg, and their testimony was along the same line, and very similar to the testimony of Goddard in this case. That testimony was admitted. The admission of it was approved, and the judgment affirmed.

In the recent case of People v. Beitzel, reported in (Cal. Sup.) 276 P. 1006, Capt. Edward C. Crossman gave testimony similar to the testimony of Goddard in this case. He had a bullet that had been taken from the body of Barbara Mauger which he was permitted to compare with bullets which he had fired through the gun belonging to Beitzel, and he testified that the bullets taken from the body of Miss Mauger were fired through the gun which had been found in Beitzel's possession, and that judgment was affirmed. The judgments in the Sacco case and in the Beitzel case both carried death sentences.

In the case of State v. Clark, 99 Or. 629, 196 P. 360, certain shells and photographs of them were introduced in evidence. Some of these were shells picked up at the scene of the shooting, and others were test shells fired from the defendant's gun. The defendant in that case was convicted of manslaughter. The court held the evidence admissible, and affirmed the judgment.

In People v. Weber, 149 Cal. 325, 86 P. 671, Weber was convicted of murder and sentenced to death. In that case bullets taken from the bodies of Mary Weber and Bertha Weber were exhibited to the jury, together with other bullets which had been fired from the pistol which a pawnbroker identified as one he had sold defendant. The admission of this evidence was approved, and that judgment was affirmed, though it carried with it a death sentence. There was a dissenting opinion in that case, but the judge dissenting did not base his dissent on any error in the admission of this evidence.

In the case of State v. Vuckovich, 61 Mont. 480, 203 P. 491, the defendant was found guilty of murder in the first degree. A .32 caliber bullet taken from the head of the deceased was compared with bullets fired through a .32 caliber Colt's automatic pistol which had been taken from the defendant, and the bullets and shells were ex-

hibited to the jury, and doubtlessly contributed in a large measure to his conviction, but that judgment was affirmed, and the evidence held admissible.

In the case of Com. v. Best, 180 Mass. 492, 62 N. E. 748, two bullets which had been taken from the body of the victim were exhibited to the jury and compared with another bullet of the same caliber that had been pushed through the gun; in that case the judgment was affirmed, though the defendant was convicted of murder in the first degree, and this evidence was held admissible.

In view of these authorities, we are persuaded that the evidence of Goddard in this case does not fall within that class of evidence that we condemned in the case of Jack v. Com., supra, but rather lies without that class and was properly admitted.

The defendant called two witnesses by whom he sought to weaken the effect of this evidence. One of these was John Pickard, who testified that he had fired five shells from a .45 caliber Colt's automatic No. 14692 which he had marked so that he could identify them, and he testified that, though his pistol was practically new, the firing pin did not hit the shell in the center. The defendant also called J. A. Steward, who filed with his evidence eight shells that had been fired through his .45 caliber Colt automatic pistol No. C-128134, that this pistol was in good condition, and he was asked where the primer struck these shells, in the middle or on the side, and he said that these primer prints varied. Goddard was then recalled. He was given the Pickard pistol and the Steward pistol, and by means of his microscope, he was able to pick out the eight shells that had been fired through the Steward pistol and the five shells that were fired through the Pickard pistol. He was then allowed to take two balls that had been fired through the Steward pistol, and the jury were allowed to examine them under the microscope to see the similarity. In like manner, the jury was allowed to examine under the microscope one of the balls fired through the Steward pistol and the ball picked up at the scene of the killing, and to see the dissimilarity. Similar comparisons were made of the shell for the purpose of showing similarity and dissimilarity; the defendant objecting all the time to everything that was done, to the time consumed, etc. As long as trials are kept within reasonable compass, the discretion of the trial court is not abused when time is given for examination of evidence and the discovery of the truth. We find

no merit in the defendant's complaint of the time consumed.

The defendant then moved to strike as evidence in chief all the evidence of Goddard that had been heard in rebuttal. His motion was overruled, and he excepted. The court said: "Gentlemen of the jury, the testimony of the witness who has just left the stand (Goddard) goes to you for the purpose of contradicting the witnesses Steward and Pickard, if it does so contradict them, and not as substantive testimony, and not for any other purpose." We regard this as properly admitted as rebuttal evidence, and the overruling of the motion to exclude this part of this witness' evidence was proper.

His next complaint is that the attorney for the commonwealth continuously referred to the bullet that had been picked up at the scene of the shooting as the "fatal bullet" or "fatal ball," whereas there was no evidence that it was the fatal bullet. We are willing to admit that it would have been better to have adopted the practice used by the witness Goddard, and to have referred to this as the evidence bullet, but the jury is supposed to be composed of men of ordinary intelligence, and they could not have been misled by the use of the words, "fatal bullet," instead of "evidence bullet," and, as the witness Goddard with one exception continuously referred to it as the evidence bullet, the reference by the attorney for the commonwealth to it as fatal bullet was thereby cured. The record shows that on another occasion the attorney for the commonwealth referred to this as the "you called fatal ball," but it is so patent that this is an error in transcription, and, from the context of the question and from other questions before and after it, it is so evident that the words actually used were "so-called fatal ball," that we regard this as immaterial.

Three balls passed through the body of Woolum, killing him instantly. One or more of these balls was necessarily a fatal ball. The same man fired all of them. The question for the jury was: "Did Evans do the shooting?" Whether this particular ball was fatal or not was not the question.

The defendant says the evidence of Goddard was highly technical, unreasonable, extremely doubtful, and therefore inadmissible, but the same could just as plausibly be said of evidence of finger prints, and that is admitted every day. He argues that the witness stated it was the practice of one factory in making pistol barrels

to make them in double lengths, to rifle them and finish them before they are cut in two, and the defendant argues that therefore these two barrels will be made exactly alike, and that hence the witness' statement that no two barrels were exactly alike is untrue; but he overlooks the fact that Goddard testified that he had three bars of steel so bored and finished, thus making six barrels, that two shots were fired from each of the six barrels, that they were marked for the purpose of testing his skill, and that he had then taken these pistols, and, by firing them, recovering the balls, and comparing them with the twelve balls given him, he was able to say from which of the six barrels they had been fired. That disposes of that objection.

Evans says all the eyewitnesses to this homicide testified for the defense and that their evidence tended to exculpate him, which is true, but whether their testimony should be believed or not was for the jury to determine.

He argues that the commonwealth wholly failed to show malice or any motive for the crime, but there is nothing in his contention about the failure of proof of malice for the jury found the defendant guilty of manslaughter, thereby expressly finding that the crime was not prompted by previous malice.

"Although the state, in a prosecution for homicide, is under no obligation to show a motive for the commission of the crime charged, evidence tending to show the existence of a motive is admissible, this rule being especially applicable when the evidence against defendant is entirely circumstantial." 30 C. J. p. 179, sec. 406; Morgan v. Com., 228 Ky. 432, 15 S. W. (2d) 273.

Motive, clearly established, tends to corroborate other evidence, and may help to confirm conclusions reached from evidence that the accused is guilty. Com. v. Feci, 235 Mass. 562, 127 N. E. 602. Another purpose of admitting such evidence is to give to the jury an opportunity to increase or diminish the punishment accordingly. See Urban v. Com., 196 Ky. 770, 245 S. W. 511. Proof of motive is not a matter without which a conviction cannot be had. In Marcum v. Com., 1 S. W. 727, 8 Ky. Law Rep. 418, the defendant was appealing from a sentence of death. This court affirmed the judgment, and, in the opinion, commented on the utter absence of evidence of motive. Society is but little interested in why Evans killed Chief Woolum, except as such evidence of why he did it may tend to throw light upon the main

question, which was, did he do it? The jury has said he did. No improper evidence was adduced before it. It was correctly instructed.

The trial was orderly conducted, the evidence supports the verdict, and the judgment entered thereon is affirmed.