## Kelly v. Commonwealth.

(Decided Oct. 15, 1935.)

716

R. L. POPE, POPE & BAKER, ELMON MIDDLETON, JAMES S. GOLDEN and W. R. LAY for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The appeal by Boyd Kelly is from a judgment sentencing him to the penitentiary for thirteen years for the killing of Fred Lewis. He is the uncle of the deceased's mother, and the men had always been intimate associates and friends. About 10 o'clock on the night of June 20, 1933, according to the defendant, he came across Lewis intoxicated downtown in Harlan and persuaded him to go home, and Lewis agreed if Kelly would go with him. They started, but instead of going home Lewis drove to the home of Mrs. Myrtle Sizemore for the apparent purpose of securing some moonshine whisky, as he did get a pint there. According to the testimony of Eugene Sizemore, both the defendant and the deceased were drunk, and they engaged in a quarrel during which Kelly struck Lewis in the head with a pistol. The witness went out of the house and the other two men followed him in a little while. He went around and entered the house through the back door, and then went to a window and looked out. He saw Lewis on the porch and heard a shot fired. Kelly was the only person out there with Lewis. This testimony is corroborated in part by other members of the Sizemore family, and by some admissions of the accused. The defendant

denied that he was drinking and that there had been a quarrel. His evidence is that he was inside the house and that Eugene Sizemore and Lewis alone were outside when and where the shooting occurred. It also got into the record that Lewis had said he did not know who had shot him and, as well, that Kelly had not done so. Lewis was shot in the stomach and the ball came out in the back and lodged in his clothing. He died the next day about 11 o'clock.

A reversal of the judgment is asked upon many grounds, all save one appearing to be without merit, and as most of them will not occur upon another trial, we write only as to that upon which a reversal must be granted, and two items of rejected evidence.

The accused had a .38 Smith & Wesson "Squeezer" revolver. The sheriff obtained a .38 Smith & Wesson "Special" revolver from the Sizemore home. The bullet which had passed through Lewis' body was preserved, and it became an important, if not a controlling, issue as to which of these two weapons had fired it."

On the trial the defendant testified that there were eight or ten different makes of cartridges for the "Squeezer" type which can be and are frequently shot in a "Special" pistol, but that a "Special" bullet cannot be fired in a "Squeezer" pistol because it is too long and will not go in the cylinder. The ball with which Lewis was killed was identified by Kelly as being an old style "Squeezer" bullet. On cross-examination there were presented to him some loaded "Squeezer" cartridges and also a "Special" pistol similar to, but not the identical one which was at Sizemore's house on the night of the homicide, and he was asked to demonstrate the fact that a "Squeezer" cartridge would not fit it. It appeared that they would not, but the defendant insisted that he could produce "Squeezer" cartridges which would fit that weapon. The exhibition and demonstration of this substituted pistol was over the objection of the defendant. His son testified to the same effect, and, further, that he had been making tests before the trial to establish the fact that some makes of "Squeezers" shells can be fired in a "Special" revolver, and that the "Special" cartridges exhibited were of a new or late style. The witness had bought five different brands of .38 cartridges, and had accompanied John Hickey, a deputy sheriff, who had the Sizemore pistol in his possession, and made some tests. Three of those

cartridges would not fit into that pistol because they were too large to go in the chambers. One fit tight and another fit exactly. Such bullet as had been thus fired in the Sizemore pistol was presented in evidence, and compared with the ball taken from the body, and the witness stated that he could see no difference in the markings. He testified that the Sizemore pistol was an old style "Special" .38, while the one submitted at the trial as being similar was a new style which would not take that cartridge.

At this point the defendant moved the court to require the commonwealth to produce the Sizemore pistol, but counsel state it could not be done as one Ray Rice had taken it to Lexington.

The defendant's son-in-law gave testimony like that of his son, saying that John Hickey had done the firing and made the tests. A subpœna had been issued for Hickey, but it was said that he had gone to Frankfort that day. In the rebuttal of all this the commonwealth presented the sheriff, who testified he did not know that Hickey had taken out the pistol, and stated that it was at that time in the possession of Rice; that he had made no effort to have the pistol at the trial because he had not been requested to do so until that morning. Another witness, a deputy sheriff familiar with firearms, contradicted the evidence in regard to the ability to fire a "Squeezer" bullet in a "Special" pistol.

One of the grounds upon which a new trial was asked related to this evidence, and what was termed "the concealment or suppression of the Sizemore pistol by the commonwealth." A hearing of the motion was had and considerable evidence introduced on this point. The pistol was brought before the court and it was developed that Hickey had previously taken it for use on a raid, and then that he and Kelly's sons had made some tests with it before the trial. He established that two of the bullets of the "Squeezer" type were fired by him from that weapon, and that two of its chambers were a little larger than the others, which permitted it to be done. He demonstrated that condition of the pistol before the court and showed that some of the bullets filed in evidence would fit into these two chambers. He said that they could have been reamed out, but they bore no evidence of having been done so recently. Hickey had had this pistol in his possession all of the time, and it had never been in the possession of defendant's sons. He had

it at his home during the trial when it was thought that Rice had gone to Frankfort or Lexington, but he had not been subpœnaed and did not know that he was wanted. Other evidence was heard pro and con concerning this matter and whether or not a "Squeezer" bullet could be fired in the Sizemore pistol.

The verdict depended principally upon whether the jury should believe the defendant's or Sizemore's testimony. So it became extremely important as to which of these two weapons had been used in firing the bullet which killed Lewis. We need not determine whether it was error to admit in evidence a pistol identified only as being similar to the Sizemore pistol, which could and should have been produced on the trial, but when it was shown on the motion for a new trial that the Sizemore pistol was different in a material respect and was capable of shooting a bullet of the character and size which killed Lewis, the new evidence was of suffiicient importance to require the trial court to grant the defendant another trial. In the light of the modern science of ballistics, it is probable that it could have been demonstrated almost to a certainty which of these weapons had been used. See Evans v. Commonwealth, 230 Ky. 411, 19 S. W. (2d) 1091, 66 A. L. R. 360.

Mrs. Mary Scott, an aunt of the deceased, related statements of the defendant on the night of the homicide which tended to show his guilt. The defendant asked her if in that same conversation she did not say that Lewis' mother had sent her to apologize for having accused him, as Lewis had told her that he (Kelly) did not shoot him. An objection was sustained, and as an avowal the witness answered not in the hearing of the jury that she had not, but the mother had sent word to him not to worry as "she did not think Fred was shot bad, or that Fred did not want anything done about it." Conceding the evidence was incompetent as substantive proof, the defendant insisted then and now insists that it was competent for the purpose of laying a foundation for contradiction of the witness. Following up the purpose, the defendant offered to testify that Mrs. Scott had brought such a message as is indicated by his question. The provision of section 597 of the Civil Code of Practice (which is applicable to criminal trials), that a witness may be impeached by showing that he has made statements different from his testimony, does not cover collateral matters. Hayden v. Commonwealth, 140 Ky.

634, 131 S. W. 521. This was collateral to the issue and the offered contradictory statements could only have gotten before the jury hearsay upon hearsay of an incompetent declaration. The court properly excluded the evidence.

Another excluded item of evidence about which exception is still being taken is that the defendant offered to testify that at the hospital that night in the hearing of the wounded man Lewis' mother had accused him of having done the shooting and he denied it and said, "There is Fred, ask him; right there he lies, ask him and he will tell you whether I did or not." The evidence was incompetent for the reasons given in Stewart v. Commonwealth, 235 Ky. 670, 32 S. W. (2d) 29, for excluding a conversation between a wounded man and one accused of shooting him. Moreover, the testimony of the defendant as to what he said there was purely self-serving.

For the reason indicated, the judgment is reversed.