THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. ANTHONY BOCCADORO, PLAINTIFF IN ERROR.

Submitted October 26, 1928—Decided February 4, 1929.

For the plaintiff in error, *J. Victor D'Aloia.*

For the state, *Joseph L. Smith,* prosecutor of the pleas, and *Simon L. Fisch,* assistant prosecutor of the pleas.

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE.   Anthony Boccadoro, the defendant below, was convicted of murder in the first degree for the killing, on the 31st of January, 1928, of one Edward C. Thompson in the town of Bloomfield, in the county of Essex, New Jersey.   The jury recommended life imprisonment, and the sentence pronounced was in accordance with that recommendation.   The present writ of error is sued out to test the validity of the conviction.

The first ground urged for reversal is that there was error in the refusal of the trial court to direct a verdict at the close of the case upon the ground that the evidence did not make out sufficient proof beyond a reasonable doubt that the defendant was guilty of the crime charged against him.   The testimony on the part of the state, in brief, was as follows:   Mr. Thompson, about eight o'clock in the evening, was in a room, with his wife, on the second floor of his home, in Bloomfield. The first floor was dark, and there was little light on the second floor, a single lamp in the room where they were sitting being the only light in the house.   Apparently he heard a noise on the first floor of the house, for he went downstairs into the kitchen, and almost immediately after arriving there, according to the testimony of some of the neighbors, there was a sound of scuffling in the room, and also what seemed like the muffled shot of a gun.   This attracted the attention of some of those living close by, one or two of whom came out of their homes.   Other neighbors were on the street near the Thompson house.   There was evidence that immediately after this noise in the house a man, who was not identified by those who saw him, probably because it was after nightfall, was seen coming from the direction of the rear of the decedent's home and close to it, walking toward the garage.   When he was seen he apparently had some light material over his body.   Inves-

tigation showed that a lace curtain had been torn from the kitchen window, which was open, that was afterwards found near the garage, indicating that some person had come through the kitchen window, torn the curtain loose in doing so, and had afterwards thrown it away. About the same time this unidentified man was seen Mr. Thompson was observed on the front porch of his home. He managed to walk across to his next-door neighbor's and there fell on the porch. A hasty examination showed that he had been shot, and the police were immediately notified of the fact. He was promptly taken to a hospital, and died either on the way there or very shortly after his arrival. His death was the result of a bullet wound, the bullet going clear through his body and being found by a police officer, who had accompanied him to the hospital, while the attendants there were cutting away the decedent's clothing for the purpose of making an autopsy. The bullet was found between the body and the clothing of the decedent, and was taken charge of by the police. There was evidence that about a month prior to this shooting the house of a Dr. Black, located in Glen Ridge, a suburb of Newark, had been entered in a fashion similar to that adopted in entering Mr. Thompson's home; that this was done while Dr. Black and his family were away, and occurred early in the evening; that some jewelry had then been stolen, one piece of which was called a maple leaf pin, and also an old-fashioned five-chambered Smith & Wesson revolver, which the doctor had owned for over twenty years. The entry into the Black house occurred on the 2d of January, 1928, a little less than a month before the entry into the Thompson home. The defendant almost immediately after the Black robbery, say within a day or so, gave to Rose Tiffany, a woman with whom he was living, a maple leaf pin, which Dr. Black identified as the one which had been stolen from his home and which he had given to his wife some twenty years before. After the murder of Mr. Thompson the police called on Dr. Black, and learned in an interview with him that his revolver had been stolen from his home, and the character of the weapon. He also told them that some two or three years before this occurred he had fired a shot from the gun into the ground near the edge of his porch to celebrate

New Year's, and had then taken out the empty cartridge, leaving one chamber of the gun empty. When called as a witness by the state, Dr. Black repeated these facts to the jury. The bullet which was fired into the ground was dug up by the police authorities, and a comparison between it and the bullet which killed Thompson indicated that they were both fired out of the same calibre gun. It also appeared that they were each of them from cartridges of the same make, many years old, and which were no longer being manufactured. Ballistic experts called by the state testified that, after a very careful examination of these two bullets, they were convinced that they had been fired from the same weapon. There was also evidence of the defendant's mistress, Rose Tiffany, that shortly after the Black robbery the defendant was possessed of a gun, which she described, and which appeared by her description to at least resemble the Black gun; that she saw him take the cartridges out of it, clean the gun, and then put the cartridges, which were four in number, back into it. She further testified that on the night of the murder of Mr. Thompson the defendant left their home on Canal street, in Newark, and which was some miles from the decendent's residence, in Bloomfield, about six-forty in the evening, having first placed the gun which she had previously described inside of the waistband of his trousers; that he returned home at about nine o'clock, in an excited condition, and told her that he had been chased by the police through back yards and over fences for about three miles; that they had fired shots at him, and that he had thrown his gun into an empty lot while he was running away. She further testified that, so far as she was able to observe, he did not have the gun on him when he returned.

In our opinion, these various facts, taken together, clearly made the question of the defendant's guilt one for the determination of the jury, and it was for that body, not for the court, to declare whether the evidence was such as to satisfy the members of that body beyond a reasonable doubt of the guilt of the accused. We conclude, therefore, that the motion to direct a verdict upon the ground stated was properly refused.

The next ground for reversal is directed at the admission of testimony by a police officer detailing a conversation which he had with the defendant after the latter's arrest, in which defendant stated that he was a housebreaker; that he carried on his work in the suburban sections around Newark, going out early in the evening, right after dark, sometimes a little later; that he would pick out a house where there were no lights showing, and sometimes he would ring the bell, that sometimes he would take a chance of finding an open window; that, if he could not find an open window, he would jimmy a pantry window or a toilet window, and go immediately to the second floor of the house and open a window over the rear porch or the front porch, and that he had done this maybe thirty or forty times while living in Newark. The argument in support of this ground for reversal is that the testimony recited was improperly admitted, under the rule which bars the introduction into evidence of other specific crimes committed by a defendant, even where these crimes are of the same sort as that charged. That this is the general rule with relation to such testimony is clearly settled in this state. The principal reasons upon which it is based, as will appear from an examination of our decisions, are the impracticability of trying a defendant for such unconnected crimes, with a view to reading his guilt thereof, if established, into the specified crime with which the jury is directly concerned, and, second, because the defendant is not prepared to defend himself against charges of specific crimes alleged to have been committed by him, but for which he is not then on trial. It is to be observed that this testimony did not tend to prove the commission of any specific crime or crimes by the defendant. On the contrary, it merely indicated that the defendant's business, by his own admission, was one the carrying on of which was condemned by the criminal law, and tended to explain the motive which induced him to enter the Thompson home, if the jury should determine that he was the person who did so. In other words, that his motive was not a lawful, but a criminal one; namely, the further prosecution of his business of housebreaking. Assuming that the rule appealed to by the defendant is condemnatory not only of testimony relating to

specific criminal acts, but also to criminal acts that are not specifically set out in the proofs, that rule has no application where the purpose of the evidence is to show that the crime charged in the indictment resulted from the attempting to carry into effect a general scheme or plan which included the commission of numerous criminal offenses. 8 *R. C. L.* 203, and cases cited. We are of opinion that the testimony objected to was properly admitted for the purpose of showing the motive which led the defendant to feloniously enter the Thompson house, if he was the person who did so.

The next contention which is made the basis for reversal is that the trial court committed error in the following instruction to the jury, which dealt with the failure of the defendant to take the witness stand in his own behalf: "If facts are testified to which concern the acts of the defendant, and which he could by his oath deny, the failure to testify in his own behalf raises a strong presumption that he cannot truthfully deny them." The argument is that this instruction was illegal because the state had failed to prove any facts that the accused was called upon to deny. But this argument seems to us to be without substance. He could have denied, for instance, that he gave the maple leaf pin, to which reference has been made, to his mistress, or, if he had admitted doing this, then he could have denied that it was the pin stolen from Dr. Black's house. Moreover, he could have denied making the statement to the police to which reference has just been made. So, too, he could have denied that he left his home early in the evening of the murder, taking a gun with him; and that he returned home without the gun. That these facts, taken in conjunction with the other facts which were proved, were incriminating seems to us to be obvious; and, this being so, the trial court was justified in commenting upon the failure of the defendant to deny them. *State* v. *Callahan,* 77 *N. J. L.* 686. As to the language used in the charge: it is an exact quotation from the opinion of this court in *State* v. *Kisik,* 99 *Id.* 388, wherein it stated that the proper instruction upon this subject is that "if facts are testified to which concern the acts of the defendant which he could by his oath deny, his failure to testify in his own behalf raises a strong pre-

sumption that he cannot truthfully deny them." For the reasons indicated, we conclude that the assignment under consideration is without merit.

The next ground for reversal is that the court erred in refusing to charge the following request submitted on behalf of the defendant: "The failure of the defendant to take the stand does not give rise to any presumption of guilt where there is no direct evidence to connect him with the crime." This ground of reversal has no basis of fact upon which to rest. The following statement appears in the charge immediately preceding that which was made the basis of the assignment of error just discussed: "The defendant did not take the stand. He is competent but not compellable to be a witness in his own behalf, but his failure to do so raises no presumption of his guilt." This instruction not only completely covers the request, but disregards the limitation contained in it; namely, that the legal rule applies only where there is no *direct* evidence connecting the defendant with the crime; and, consequently, was more favorable to the defendant than that which was asked for.

It is next contended that the court erred in making the following statement to the jury: "Now, gentlemen, the question which you must decide in this case is simply this: Did Boccadoro kill Thompson?" The argument is that this instruction was improper because the jury should have been told to find not only that fact, but also that the killing occurred during the perpetration of a burglary. The answer to this contention is that the court had already instructed the jury that the facts proved in the case, showing that Mr. Thompson came to his death as the result of a bullet fired into his body by a person who had forced his way into the Thompson house in an attempt to commit burglary, were uncontroverted, and that, under the statute which the court read to the jury, the person who fired the shot was guilty of murder in the first degree. Taking the two statements together, the law upon this question was correctly expounded to the jury, the meaning of the instruction being that, as it was practically conceded that the killing was done by a man attempting to commit a burglary, the only question left for determination was whether the defendant was or was not that man.

The last ground for reversal is that the verdict is against the weight of the evidence. In the case of *State* v. *Karpowitz,* 98 *N. J. L.* 546, this court, after pointing out that it is the province of the jury to pass upon the questions of the credibility of witnesses and the weight to be given to their testimony, then declared that an appellate court should not set aside a verdict in a criminal case upon the ground that the verdict is contrary to the weight of the evidence unless it clearly appears that such verdict is the result of mistake, passion, prejudice or partiality. With this rule in mind, our consideration of the proofs leads us to the conclusion that the verdict in the present case, finding the defendant guilty of the crime charged against him in the indictment, cannot be said to be contrary to the weight of the evidence.

On the whole case, we conclude that the conviction under review should be affirmed

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, KALISCH, KATZENBACH, CAMPBELL, LLOYD, WHITE, VAN BUSKIRK, MCGLENNON, HETFIELD, DEAR, JJ. 13.

*For reversal*—None.