STATE OF IOWA, Appellee, v. CLARENCE CAMPBELL, Appellant.

No. 40701.

DECEMBER 16, 1931.

John Fletcher, Attorney-general, Carl S. Missildine, County Attorney, and Alexander M. Miller, Assistant County Attorney, for appellee.

George A. Wilson and Tom K. Murrow, for appellant.

WAGNER, J.—The defendant, Clarence Campbell, and Kenneth Sonderleiter were jointly indicted for the crime of murder of Samuel Dushoff, familiarly known as Jack Harris, and hereinafter the deceased will be referred to by the latter name. Campbell was given a separate trial, and found guilty of the crime of manslaughter.

Before proceeding with the complaints of the defendant, we deem it advisable to briefly refer to the facts, as shown by the record, leading up to the time of the shooting of Harris. We are abidingly satisfied that Harris lost his life as the result of a shot from a revolver by the defendant, Clarence Campbell, on the evening of April 26th, 1930. It is shown by a waybill introduced in evidence that on April 21, 1930, a shipment, consisting of two crated drums, was consigned to one therein named as J. A. Trumbull. These drums, each having a capacity of about fifty gallons, were delivered by the clerk of the Railway Express Company to one Hanlon, who was engaged in the transfer business. They were billed as "compound," and were delivered by Hanlon at "Dickerson's place," at the suggestion of Harris. The defendant, Campbell, resides in Chicago. Dickerson, at that time, resided at 709 West 32nd Street, Des Moines, which is about three and one half blocks north of Ingersoll Avenue. About two o'clock in the morning of April 26th, Campbell and two others appeared at the Dickerson home. The Dickerson family were in bed. There was a knock at the door, and the housekeeper responded to the alarm, and was falsely told that they were police officers. In this manner they gained admittance to the home. The housekeeper informed Dickerson, who then appeared in their presence. Dickerson testified that he did not know any of them at that time; that, while Campbell stood guard over him, the other two went down into the basement, where they remained ten or fifteen minutes, and then came from the basement to the main floor of the house, and the three caused him to leave his home and enter an automobile; that the defendant, Campbell, and he occupied the rear seat,

and the other two men the front seat of said conveyance; that, as they proceeded, another car was following in close proximity; that they took him out on University and 65th Street, where he was caused to get out of the car, and they informed him that they were going to throw him into the coal mine, but didn't do so, and took him back into the car and drove further out to about 72nd Street, at which place they told him they were going to hang him to a tree.

"Q. And had they said anything to you up to that time what they wanted to take you out for? A. Wanted to know where my plant was. Q. What did you tell them when they said 'where is your plant' or wanted to know where your plant was? A. I told them I didn't have any."

He further testified that at this place they threw a rope over a limb and started to put the other end around his neck; that they asked him where his plant was and he told them he didn't have any; that they put him back in the car, saying that they were "going to take me out along the road and shoot me in the head;" that they then took him back on Hickman, stopped the car, "and told me to get out, they were going to shoot me in the head. I started getting out." He testified that a gun was fired, and he was struck in the back part of the head, leaving a mark which was visible at the time of the trial, in September, 1930. He testified: "I do not know whether I got hit with a gun or whether I got shot there;" that they then blindfolded him and took him to a basement,—where, he does not know; that after he had gotten to the basement, the defendant, Campbell, asked him to call Jack Harris; that he used the telephone and called Harris's home and talked to the wife of Harris; that two of the parties stayed with him and the rest left, being gone about two and one-half hours, when they returned, saying they could not find the Jew (presumably Harris); that they then took him to 31st Street, just south of Grand Avenue, where they released him; that he then removed the blindfold from his eyes, and soon met Mrs. Jack Harris, who drove him to the Harris home at 217 Terrace Drive. Mrs. Harris testified that a car, in which Sonderleiter and two other gentlemen were riding, stopped her at 32nd Street, whether before or after she picked up Dickerson is not shown by the record.

There were no further developments in the case, as shown by the record, until about 4:30 or 5:00 o'clock that evening, when Sonderleiter and Campbell called upon Hanlon, who was engaged in the transfer business. Sonderleiter said to Hanlon: "You got some stuff from the American Express Company,—where did you take it?" and Hanlon answered. "I gave him the address; then they left. I found out later it was Dickerson's place." Dickerson testified that he did not hear from Campbell during the day, but about 8 o'clock in the evening, Campbell called him by phone, and asked him "if Jack was with me, and I said yes, and hung up the phone. He called up about fifteen minutes later; Jack answered the phone, and after answering the telephone, Jack said, 'Come on, let's go down to 31st and Ingersoll.' We went down to 31st and Ingersoll in Jack Harris' car."

The Brown Drug store is in the northeast corner of the intersection of Ingersoll Avenue, running east and west, and 31st Street, running north and south. The entrance to the building is in the southwest corner. It is shown that Campbell entered the drug store and asked permission to use, and did use, the telephone; that he then bought a couple of cigars, and stepped out onto the porch or entrance, with a gun in his hand. It is shown that a car was standing in Ingersoll Avenue near the drug store, facing west. In response to the telephone call made by the defendant, three individuals, consisting of Harris, his brother, and Dickerson, came from the Dickerson home in Jack Harris's car, coming down 31st Street from the north. Jack Harris was driving, and the rear seat was occupied by his brother and Dickerson. Jack Harris was armed with a revolver, and Dickerson had both a revolver and a shotgun. The Harris car was stopped to the north of the intersection and on the opposite side of the street from the drug store. When the car stopped, the battle began. There is testimony from which the jury could well find that the defendant fired the first shot. There can be no doubt that he fired two shots. Shots were also fired by the occupants of the Harris car, the defendant receiving a shot in the eye from the shotgun in the hands of Dickerson. Just about this time, the car standing near the drug store moved in a westerly direction, and there was a shot coming from that car, which presumably hit the top of the radiator shell of the Harris

car, as there is a dent there, so indicating, a photograph of which was introduced in evidence. Harris got out of the left side of the car, and his brother and Dickerson out of the right side. Harris was shot immediately after, or in getting out, and dropped by the side of the car. The bullet entered the right scapula, passed through the spinal column, severed the spinal cord at about the sixth segment, and after his death was found in the left thoracic cavity. The wound from the shot was the cause of his death, which occurred on April 28th. After the defendant was wounded, he retired to the drug store and entered the basement, where he was found by an officer who soon appeared upon the scene. The defendant surrendered to the officer his gun, which was a 38-caliber revolver, and had in it two fired shells and four which were unfired.

We will now consider the complaints of the appellant. It is shown in the testimony of Brophy, taken before the grand jury, that he is a detective in the city of Des Moines. He testified before that body:

"I took a statement from James Dickerson. We have two statements from James Dickerson: one, the long one, was taken by myself and Detective Miller. It was taken down by Irene Rinker in shorthand and transcribed, and signed by James Dickerson in our presence. After it was transcribed he read the statement over in our presence, and signed it in our presence. The other is a short one taken by Pedersen and Paul Castelline. I did not witness the taking of that statement or signing of it. I took another statement from William Dushoff,—that is, Jack Harris' brother. He also made two statements: one a short statement, taken by Inspector Pedersen and Paul Castelline, which I did not witness; the other taken by myself and Detective Miller. Miss Rinker took that statement and transcribed it, and he read it over and signed it in my presence. These are both copies of those statements."

The testimony before the grand jury also refers to signed statements signed by Fuller, the defendant, Sonderleiter, and his wife, and to an unsigned statement made by Campbell.

The defendants Campbell and Sonderleiter filed an application asking that an order issue, directing the County Attorney to place on file in the office of the Clerk the aforesaid state-

ments and furnish counsel full, true and complete copies thereof. This application was resisted by the County Attorney, and in his resistance he showed that, at the time of the grand jury investigation, said body had under consideration, not only the charge against defendants Campbell and Sonderleiter, but also a charge against Dickerson and Dushoff for the crime of assault with intent to commit murder, and also a charge against Fuller and Mrs. Sonderleiter for illegal possession of intoxicating liquor; that the statements signed by Dickerson, Dushoff, Fuller and Mrs. Sonderleiter were not presented to the grand jury in support of the indictment against Campbell and Sonderleiter, "nor does the state of Iowa intend to offer said statements in evidence as a part of its main case in the trial of the above-entitled indictment. * * * That as a matter of co-operation and gratuity, the state of Iowa hereto attaches to this resistance and makes a part thereof a true and correct copy of the conversation with Kenneth Sonderleiter, the conversation with Clarence Campbell, and a true and correct copy of the statements signed by Sonderleiter." It thus appears that the defendants were furnished copies of the statements made by them. The order asked by the defendants Campbell and Sonderleiter was denied by the court, and this presents the first matter for our consideration. The appellant's complaint is directed at the refusal of the court to sustain his application relative to the statements of Dickerson and Dushoff. He relies upon Section 13714, Code, 1927, which provides:

"When an indictment is found, all minutes and exhibits relating thereto shall be returned therewith and filed by the clerk of the court."

As claimed by the State, said statements were not used in support of the indictment against this defendant and Sonderleiter. They were not, and could not have been used during the trial as substantive evidence in support of the charge against them, as they would have constituted only hearsay. The substantive evidence of Dickerson and Dushoff, during the trial of the instant case, was their oral testimony elicited from the witness stand. They were witnesses before the grand jury, and the appellant was fully apprised of what their testimony would be from the minutes thereof attached to the indictment, a copy of which was furnished to him.

Moreover, we have held that the provision of the statute requiring exhibits used by the grand jury during its investigation to be filed in the office of the clerk with the minutes of the testimony is not mandatory, but only directory. See State v. Howard, 191 Iowa 728; State v. Burris, 198 Iowa 1156. It is true that in the latter case we said:

"* * * and at all times the trial court has the power, and . should exercise the same, to require the State, upon application by the defendant, to permit an inspection, under proper conditions, of any and all exhibits which are used before the grand jury and which are intended to be offered in evidence upon the trial of the case."

But in the instant case, the statements of Dickerson and Dushoff were not used in any way during the trial, and as hereinbefore stated, could not have been used as substantive evidence on the trial of the case in support of the indictment. Also, see State v. Williams, 197 Iowa 813. It is quite apparent that there is no merit in appellant's complaint at this point.

 The evidence of Dickerson, hereinbefore set out, relative to what transpired in his home in the early morning of April 26th, after he and his family had gone to bed, the conduct of the defendant, Campbell, at that time and thereafter, in taking him on the automobile trip, as hereinbefore stated, the threats made, and the taking of him to a basement, the location of which he did not know, because of being blindfolded, was admitted over the objections of the defendant, and the defendant now alleges error because of said ruling. It must be borne in mind that the "drums of compound" had been delivered by Hanlon to Dickerson's place at the suggestion of Harris. It must also be borne in mind that, while Dickerson was in confinement in the unknown basement, he was requested to call Harris by phone, and that during the period of his confinement, and while he was in the unknown basement, some of the party were apparently in search for Harris, and reported, before Dickerson was removed therefrom, that they were unable to find "the Jew." The testimony of Dickerson, which was admitted by the court, has an important bearing as evidentiary facts upon the motive of the defendant, Campbell, and for that reason was clearly admissible. It is always competent to prove a motive for the com-

mission of a crime, and evidence relative thereto is admissible as having more or less weight according to the other proved facts and circumstances with which it is related. It is quite apparent that there is no merit in appellant's contention at this point. See State v. Brazzell, 168 Iowa 480; State v. Kuhn, 117 Iowa. 216; State v. Carlson, 203 Iowa 90.

It will be noted from the aforesaid statement of facts, that three shots were fired in the direction of the Harris car, two by the defendant, Campbell, and one by an occupant of the automobile which passed from the south of the drug store in a westerly direction along Ingersoll Avenue. The State deemed it of importance to trace the bullet found in the body of Harris as coming from the gun fired by the defendant. Therefore, the revolver taken from the defendant at the time of his arrest, the two empty shells, and four loaded shells found therein, the bullet taken from the dead body of Harris, and also a second bullet which was found embedded within the walls of the left side of the Harris car, were taken to Calvin H. Goddard, a ballistic expert in Chicago, whose testimony is the storm center of the defendant's attack. The defendant, in his assignments of error, avers, in substance, that the competency of said witness to testify as an expert or skilled witness upon the subject of inquiry was not shown. There is no merit in this contention, as will be found from the testimony hereinafter referred to.

The appellant's sole remaining complaint as to the testimony of said witness is the overruling of his objection to an interrogatory, the answer to which he claims invaded the province of the jury, and the court's refusal to strike the answer. We deem it advisable to quite fully set out the testimony of this expert witness. As we proceed with the testimony of said witness, it will not be necessary to refer to appellant's objections, other than the one in a single instance that the testimony called for would constitute an invasion of the province of the jury, as aside from the question of his competency, that is the only question presented by appellant's assignments of error. The witness testified as to his occupation, that he is a professor in Northwestern University Law School, and director of Scientific Crime Detection Laboratory, Northwestern University, Chicago.

"Q. What schooling have you had to prepare for that work? A. I have a Bachelor of Arts Degree from Johns Hop-

kins University, and I am a graduate of the Regular Army Medical School in Washington. Q. What special training have you to prepare you for the special line of work you are doing now? A. Ordnance officer of the army. I have a commission as lieutenant colonel in the ordnance reserve at the present time. I have been at various manufacturing arsenals in this country and taken a special course in the manufacture of rifles and pistols, and rifle and pistol ammunition and powder, and as an individual observer, I have studied the manufacture of small arms and small arms ammunition in practically every American factory, and in factories in England, France, Belgium, Spain and Germany. For a number of years past I have devoted all my time to the collection of data on arms and ammunition manufacturing, collection of apparatus for use in identification work, and collection of specimens which would give me the reference collection for such work. Q. Have you made any special study of firearms and ammunition that was used in murder cases? A. Yes, sir. Q. And what special training have you had along that line? Without saying who you were consulted by, what examination did you make and what cases were you studying? A. I was in the past year,—I worked upon somewhere between one hundred and two hundred murder cases involving the firing of arms, I should imagine. Q. As a preparation for giving testimony, have you made any special study of any particular cases? A. I have made special study of the subject in all the cases to which I have referred. Q. Have you made any special study of this kind of work for any particular institution or publication? A. I have made studies for the Department of State and the Treasury Department, and in conjunction with the Department of Commerce, the Bureau of Standards at Washington, D. C., which has established a department,—it might be called 'Firearms Identification,'—along lines similar to these that I have in my own office. Q. Have you been connected with the police organization or law enforcement organizations in your work and study? A. I am a lecturer in the New York Police College on firearms identification; technical expert to the Pennsylvania State Police on firearms identification. Q. What apparatus and equipment do you have for carrying on your work in those lines, Professor? A. I have a reference collection of a good many arms, I would say close to one thousand different

arms, small arms and many thousands of different types of un-fired bullets, empty fired shells and loaded cartridges, of fired bullets fired through known makes of arms of different types, data, covering the manufacture of different types of arms in use in this country today and a great many no longer used, and of a large proportion of those in use overseas. I have instruments which have been developed largely in my own laboratory for the identification of projectiles in shooting cases, that is, including microscopes, photographic apparatus, micrometers, special scales, and so on. Q. What special study have you made, if any, in regard to microscopes? A. I have been using the microscope for something over twenty years now on various business. Q. What kind of microscopes do you use in connection with your work? A. In the firearm work we use what is known as a comparison microscope. It is an instrument made of two single microscopes connected by a cross-arm fitted with two sets of prisms, which enables the user to fuse two images in a single eyepiece and compare these two pieces at the same time.''

It will be noted from the foregoing, and from other testimony hereinafter given, that the witness has made a special study of the subjects concerning which he testified, and that he has suitable instruments and equipment with which to make the test hereinafter referred to. In Jack v. Commonwealth (Ky.), 1 S. W. (2d.) 961, in rejecting the testimony of certain witnesses offered as experts on the same subject of inquiry, the Kentucky court refers as authority to an article written upon the subject of Forensic Ballistics by Calvin H. Goddard, who is the witness in the instant case. We need not give the question of his competency, as shown by the record, any further consideration.

The witness further testified: ''Q. Is it possible with your equipment and experience to determine by examining a fired bullet its caliber and type? A. Ordinarily it is,—yes, sir.'' He testified that this is done by studying the length, diameter, weight, contour and general details of the shape of the bullet in question, comparing this with known standards that have been fired, standards of various calibers, types and makes, and by process of elimination matching it against a certain type, caliber and make, and eliminating all other types. ''Q. Is it possible, Professor, by examining a fired bullet for you to determine the company that made the bullet? A. Ordinarily,—yes, sir.'' He

continued that this is determined by reason of the fact that no two bullet companies produce bullets of the same caliber and type which are identical in all details; that a bullet of a certain type made by one company will differ sometimes slightly in length, sometimes slightly in diameter, sometimes in shape of the face; it may be hollow, whereas the face of the bullet made by a known company will be flat; in the position of the cannelures or grease grooves which encircle the bullet; and also on the body; and the question of the knurling marks on the cannelures. "These are the small ridges which are cut into the cannelures by the machine, and the number of teeth on the walls cutting these ridges differ in size, type and location in the different factories. In this way, we have, ordinarily at least, six or more points in which two bullets of the same type or caliber will differ, as produced by different companies. Q. Is it possible by examination of a fired bullet to tell the type of firearm it was fired from? A. Ordinarily,—yes, sir." He said that this can be done by reason of the fact that different arms companies employ different methods of rifling their arms; that one company, for instance, will employ six grooves twisting to the left; that another company will employ five grooves twisting to the right; that where two different companies employ the same number of grooves twisting in the same direction, as they sometimes do, they will differ in width of groove or in slant, in the rate of pitch at which the grooves turn, so that there will always be one or more points of difference which can be taken into consideration and determined by having on file the rifling specifications of the different companies; that each company keeps the figures covering the design of its barrels and the way they are cut. "And my studying a fired bullet, counting the number of grooves it has received going through the barrel, noting whether the question of whether they are to the right or left, noting their width and their angle, which can be done with proper microscopes, and we can determine the rifling standards of the barrel through which they pass, and then consulting our factory records and pointing out on some particular factory make as different from some other make." "Q. Professor, is it possible to tell by examining a fired bullet what kind of powder was used in firing that particular bullet? A. Ordinarily." He said that this can be done by reason of the fact that black powder

is a physical mixture of carbon, saltpeter, charcoal and sulphur, which is produced in little grains that resemble small grains of coal; that they contain free carbon and free charcoal, and this free carbon blacks the face of the bullet at the time of the firing, and the little grains of powder have so much weight for their size, they are of such high specific gravity, that at the time of the firing the grains out of the forward end, they are driven in by the force of the bullet and these little pock marks; that a bullet fired by black powder leaves little pock marks plainly; that smokeless powder contains no carbon whatever; that the grains are very light and at the time of combustion no free carbon is left on the face of the bullet, and the grains have not enough weight to puncture the bullet, and when fired by smokeless powder is smooth and not discolored. ''Q. Doctor, does the firing of a bullet through the barrel of a gun leave any marks on the bullet? A. It does. Q. Does the same firearm make the same marks on each successive bullet fired from it? A. The bullets fired successively from the same firearm will bear a great many identical markings. Not every mark will be the same, however. No two things in my experience are ever identically alike, but they will bear appearances of similar markings which will make comparisons readily possible. Q. Is it possible by examining a firearm to tell whether it has been fired since the chamber was cleaned? A. Ordinarily it is, yes. Q. How can this be done? A. With an instrument which we call a helixometer, or a little periscope, which we pass down the barrel, which has lanes and prism at one end and an eyepiece at the other, by which we can explore the entire inward barrel. If it has been fired, a deposit of residue will be present which can readily be seen by such an instrument. Q. Is it possible to tell by examination of a firearm what kind of powder was used since it has been cleaned? A. Ordinarily. Q. How do you do that? A. In case of smokeless powder, it leaves a faint greasy black dark film on the surface of the bore, with an occasional unburnt powder grain here and there scattered through the bore. Black powder on the other hand leaves a very heavy deposit; 57 per cent of black powder remains as a solid residue after firing; and this deposit cuts practically the entire surface of the bore and fills up the corners upon the lanes and grooves and is quite

readily appreciable from end to end of the bore. The difference between it and smokeless is very, very marked.''

The witness was then handed the revolver which was in the hands of the defendant at the time in question, and stated that the same was brought to his office April 30th, 1930; that two of the chambers at that time indicated that cartridges had been fired from them since they were last cleaned, and four of the chambers were clean; that the barrel contained smokeless powder residue. He was then handed the bullet which was taken from the body of Harris and marked Exhibit 2, and stated that it came into his possession at the same time; that an examination of the same showed the bullet to be of the lead type, as contrasted with the jacket type of bullet of the variety known as .38 Smith and Wesson special, which had been fired by smokeless powder through a Colt revolver, and which had been produced in the factory of the United States Cartridge Company. (The revolver in question is a Colt Army Special .38 caliber). He was then handed another bullet, Exhibit 3 (the one taken from the side or wall of the Harris car), and stated that that bullet came into his possession at the same time; that an examination of it showed this bullet also to be of the lead type or variety known as .38 Smith and Wesson special, which had been fired by smokeless powder, also made by the United States Cartridge Company, and although much flattened, so that not all the grooves on it could be counted, those present indicated that it had been fired through an army revolver with six grooves inclined to the left. He was then handed a box containing two empty shells (those taken from the gun of the defendant at the time in question), and stated that they came into his possession at the same time; that his examination of them revealed that they were manufactured by the United States Cartridge Company, had contained smokeless powder, and were of the .38 Smith and Wesson type. He was then handed a box containing three loaded cartridges (three of those found in the revolver of the defendant when he was arrested), and stated that from his examination of them, one cartridge was a .38 Smith and Wesson type, loaded with a lead bullet and manufactured by the United States Cartridge Company, and contained smokeless powder; that the other two were of the same type .38 Smith and Wesson special, loaded with lead bullets and smokeless powder, but made

by the Remington Arms Company. ''Q. When Mr. Pettit came to Chicago to your office, did he bring any other loaded shells than the three you have there? A. He brought one additional .38 Smith and Wesson Special loaded lead bullet, smokeless powder, made by the United States Cartridge Company. Q. What did you do with that? A. I fired it through the revolver in evidence, and fired the bullet into a receptacle filled with cotton waste, recovered it from that receptacle, took the empty shell from the chamber of the gun, and I have the fired bullet and the empty shell in this box'' (marked Exhibit 6). The witness then exhibited his microscope used by him in his work, and was asked what test and examination he made, to which he answered: ''I took the bullet Exhibit 2 (the one taken from the body of Harris) and placed it beneath one type of a comparison microscope, and then took the bullet in box Exhibit 6, which I had fired from the pistol Exhibit 1, the revolver, and placed that beneath the second type of comparison microscope. I then studied the images of these two bullets through the eyepiece of the microscope revealing the two, bringing the various parts of them into approximation, so that I could satisfy myself whether they were out of the same make of gun in the first place; and, secondly whether they were out of the same individual gun. I found the rifling marks on the two bullets of the same character, the same part, the same width, same angle.''

He then testified that he took photographs of the two bullets, five of which, duplicates of each other, were then produced. These photographs are in enlarged form. These photographs consist of four sections, the witness explaining that the first picture, reading from left to right, is one of the evidence bullet, Exhibit 2; that the second picture is one of the test bullet, Exhibit 6; that the next picture is a composite picture, the bottom portion of which is another duplicate picture of Exhibit 2, with cut sections of a duplicate picture of Exhibit 6 overlying it; and that the last picture is a composite picture also, the bottom portion being a duplicate picture of Exhibit 2, with other cut sections from a duplicate picture of Exhibit 6 overlying it. He was then asked: ''Now, Professor, will you explain to the jury what you observe and what conclusion you reached from an examination of this picture?'' To which an objection was made by the defendant, that it is an attempt on the part of the prosecution

and this witness to usurp the province of the court and jury. The objection was overruled, and the witness answered: "I observe the presence of a large number of identical fine markings on the evidence bullet Exhibit 2, and on the test bullet Exhibit 6. In the fourth picture of the set I undertook to draw identifying lines and prove them, which point out the presence of these fine markings. The conclusion I reached as a result of a study of these pictures was to the effect that both of these bullets had passed through the same barrel." The defendant moved to strike the answer as an attempt to usurp the province of the court and jury. "Q. I notice on this picture here you have lines numbered 1 to as high as 15, or I think 16. Will you describe those lines as to what they show to you? A. I have three series of lines: the top series numbered 1 to 10; the second, 1 to 16; and the third, 1 to 16. Each series is drawn to corresponding points which are commonly present on the upper picture and on the lower picture, and call attention to the fact that each of these pictures does have at least that many points of identical markings, common one with the other. Q. And can you explain to this jury how these lines that you have marked here are made on this bullet Exhibit 2, and Exhibit 6? A. Yes, I can. Q. Go ahead and explain how these lines are made on these bullets. A. The markings left on the fired bullet consists primarily of the lane and groove markings of the barrel. The barrel is rifled with spiral grooves in order to spin the bullet, by reason of which the bullet flies further and truer than if it was not spinning. The lanes are the portion of the bored surface between the grooves. Naturally when the grooves are cut out there is going to be material remain between them elevated with respect to this point which constitutes the grooves. The grooves are cut out by rifling tools which consist of small cutting edges. The secondary cutter as used in the Colt factory, for instance, which cuts the six spiral grooves in the barrel. This cutter appears relatively at right-hand angles to the long axis of the barrel, and cuts a groove exactly its own width, with a sort of a hoeing motion. It scrapes first a small section of metal from the barrel where the first groove is to be made. The whole barrel is rotated to a position where the second groove is to be administered, and this scrapes the second groove, and it is rotated on the spiral. The barrel is then rotated again to the position

for the third groove, brought into place, and this cutter starts the third groove, and so on it goes, all the way around the barrel, starting as many grooves as the barrel is ordinarily to contain. Having been all the way around the ground, the cutter is automatically lifted, so it starts the second travel, and it scrapes a little more metal, and so on it goes, on around, and scrapes a little more metal, until they vary from the different factories about the five-thousandths of an inch. This cutter edge is theoretically a perfect arc, cutting arc-shaped grooves in its movement. Practically, when metal is drawn against metal no perfect edge exists. And this theoretical perfect arc-shaped edge under the microscope shows a number of fine teeth. These teeth are constantly crumbling by the wear upon them as the cutting edge is drawn through the barrel, and naturally they vary in their arrangement from moment to moment. When the cutter makes its last draw through a certain groove it leaves in the bottom of the groove a series of tiny barrel lines which correspond to the position shown in the microscope of the teeth or edges of the teeth when it is drawn through. When it rotates and cuts the last cut, it leaves another series of tiny barrel lines on the bottom of the groove, different from the ones left by the preceding one by reason of the fact of the wear that it has undergone. The next groove it makes another series, which again vary. The grooves in the same barrel will have the same width, same depth and angle, but they will be unlike each other with reference to the fine barrel ridges left in them by the teeth of the cutting edge. These edges when the bullet is fired through that barrel are covered with powder, and it is these fine barrel ridges that we look for in our pictures and under the microscope to determine whether two bullets have passed through the same irregularities in the same barrel or not. Q. How many grooves did you find in the barrel of this Exhibit No. 1? A. Six grooves. Q. And those grooves, are they spiral grooves in the barrel? A. They are. Q. Which way does the spiral run? A. To the left. Q. From what end of the gun? A. Either way you look, they run to the left.'' With reference to the taking of the pictures he stated: ''They were taken—the bullets were placed on vertical uprights directly before the camera, directly in the axis of the lens; the single one is photographed, and then the bases on which they were mounted were shifted over so that the second

bullet comes directly in front of the camera, and the second bullet is photographed the same distance from the lens and under the same lighting conditions as the first.'' The witness was then asked to explain to the jury how he used his microscope in the examination of the bullets in question, and he answered: ''The bullet in evidence is placed on this metal holder and is fixed to the holder with this plastic material which enables one to hold and fix it without leaving any marks upon it. That holder is then put in this slide and the test bullet is placed on a similar holder fixed to it with similar plastic clay and put in the second microscope. The images of these two bullets travel by the microscope tubes and are then caught by the prisms in the end of the tubes which throw the images in together to a point where they strike a second set of prisms and they are then thrown up side by side in this single eyepiece. The eyepiece is divided into two equal parts vertically. When we look in the eyepiece we seen the compound image, the base of which is supplied by the evidence bullet, and the nose or pointed end of which is supplied by the test bullet. Q. Do I understand that you look at both bullets at the same time? A. You see portions of both bullets fused into a single bullet.'' He then placed the two bullets, Exhibits 2 and 6, in position, and explained that in making the examination through his instrument: ''I placed the bullet Exhibit 2 in a fixed position, and I rotated the bullet Exhibit 6, testing one area of that, or one groove or lane of that, against the fixed groove or lane in Exhibit 2, to see whether I can find identical markings present on the two bullets which fuse together on the combined image. If I did not find them at first I continued to rotate the test bullet to locate the point where such fusion of identical markings will take place. This position is one in which a fusion does take place, and the image is built up right across the picture.'' At this stage of the examination, on the request of the State, the jury were permitted to look through the microscope at the two bullets, Exhibits 2 and 6. He was then asked: ''Suppose that two or more guns were made by the same factory and by the same machinery, would it be possible from your experiments to tell what bullet came from each individual gun? A. Yes, sir. Q. How do you know that? A. By actual experiment. Q. And by what experiment? A. By the fact that in an actual experiment six

barrels were made at the Springfield Armory, the government armory, where the Springfield rifle and the .45 automatic pistol is made, six barrels were rifled consecutively on one machine with no change or adjustment of the cutting apparatus whatsoever, and two of these barrels were then assembled into forms by another officer and bullets were fired through each." "By the Court: Were you present at the time that was done? A. I was present when the barrels were put into the forms and saw him fire them. Q. Were you present when the barrels were manufactured? A. I was present when they began them. I didn't go through the particular steps, but I was present when they were numbered to show their order, and I saw them when they came out in that same order with the same numbers on them. Q. Do you know of your own knowledge that these barrels were run through the same machine? A. I did. Q. And did you know of your own knowledge that these identical bullets were put in the forms these bullets were fired from? A. I did. Q. You may go ahead and relate now the results of your experiments. A. After these barrels had been assembled into the pistol the adjutant of the armory fired two shots through each in my presence into a receptacle of cotton waste and then removed the bullets from the cotton waste, the waste being used so that the bullet would be saved from deformation, and he put on the base of each bullet a mark which would indicate to him which bullet was fired through each barrel. The Court: Were you present when all of this was done? A. Yes, sir. He then gave me the twelve bullets bearing these marks which had no particular significance to me, and I compared them under my microscope and matched them all into six separate pairs according to the six barrels through which they had been fired. Among the twelve bullets there were six pair which bore an imprint of individual markings present on each of the pair and not pres nt on any of the other bullets in the set."

The question for our determination is whether the court should have sustained the objection to the question: "Now, Professor, will you explain to the jury what you observe and what conclusion you reached from an examination of this picture?" Clearly, that portion of the question as to what he observed and his answer relative to the observations made by him as an expert or skilled witness were proper. Did that portion

of the question asking for the conclusion reached by him from an examination of the pictures, and his answer, ''The conclusion I reached as a result of a study of these pictures was to the effect that both of these bullets had passed through the same barrel,'' invade the province of the jury? We answer in the negative. The jury had the benefit of the expert, scientific study, special training, knowledge, skill and experience of the witness, and a full explanation of the exhibits. The theory upon which testimony such as was given by the witness Goddard is admissible is that the subject matter of the inquiry is so peculiarly within the range of scientific knowledge or special training and skill that to exclude it would work a denial of the only proof competent to establish the fact. See State v. Morphy, 33 Iowa 270; Shelton v. State, 34 Texas 662. In State v. Morphy, 33 Iowa 270, the expert was asked:

''From your examination of the body of the deceased, what, did you conclude, was the cause of his death?''

This court held the question proper, saying:

'' 'The general distinction is this, that the jury must judge of the facts for themselves, but that whenever the question depends on the exercise of peculiar skill and knowledge that may be available, it is not a decision by the witness on a fact to the exclusion of the jury, but the establishment of a new fact, relation, or connection, which would otherwise remain unproved. Not to admit such evidence would be to reject what is essential to the investigation of truth.' ''

In Evans v. Commonwealth (Ky.), 19 S. W. (2d.) 1091, the same witness, Goddard, gave practically the same testimony as was given in the instant case, as can be found from a reading of the opinion. The witness there testified ''that he was convinced that the bullet that had been introduced in evidence had been fired through this pistol 376281.''

In State v. Boccadoro (N. J.), 144 Atl. 612, the opinion states:

''Ballistic experts called by the state testified that, after a very careful examination of these two bullets, they were convinced that they had been fired from the same weapon.''

The conviction or conclusion of an expert or skilled witness is, after all, only his belief, his opinion, or best judgment. The question objected to did not ask for the fact as to whether or not the two bullets passed through the same barrel, and neither did the answer state as a fact that the two bullets passed through the same barrel. The fact was left for the determination of the jury, taking into consideration the opinion of the witness Goddard upon the subject and the credibility which the jury saw fit to give to him as a skilled or expert witness. In Evans v. Commonwealth (Ky.), 19 S. W. (2d.) 1091, the court, in passing upon this proposition, said:

"The statement made by this witness of which the defendant is complaining was this: 'I am convinced as a result of this test that the bullet in evidence was fired through the pistol in evidence 376281.' A reading of that answer shows the witness did not state that as a fact, but stated that, from his observation, he was convinced. In other words, he stated that as his opinion."

The witness Goddard, as shown by his testimony, has made a special study of and is experienced in the subjects concerning which he was interrogated, and is shown to have had suitable instruments and equipment with which to make the test inquired about, and therefore, as such expert or skilled witness, his opinion upon the subject of inquiry is competent, a rejection of which would be a serious impairment of the rights of the State in the investigation of truth. For cases in which similar testimony has been held competent, see Evans v. Commonwealth (Ky.), 19 S. W. (2d.) 1091, hereinbefore cited; State v. Boccadoro (N. J.), 144 Atl. 612; Galenis v. State (Wis.), 223 N. W. 790; People v. Beitzel (Cal.), 276 Pac. 1006; State v. Clark (Or.), 196 Pac. 360; People v. Weber (Cal.), 86 Pac. 671; State v. Vuckovich (Mont.), 203 Pac. 491. The testimony in Galenis v. State (Wis.), 223 N. W. 790, is not set out in the opinion, but the Supreme Court of Kentucky in Evans v. Commonwealth, supra, states that this same witness, Goddard, testified in the case of Galenis v. State, supra, saying:

"We have before us a printed abstract of that record and the briefs in that case. His testimony there is very similar to his testimony here," etc.

The Supreme Court of Wisconsin in its opinion states:

"* * * the gun he owned was produced and proof made by competent evidence that it was the weapon from which the bullet found in the body of the victim was fired."

The appellant relies upon our pronouncement in State v. Steffen, 210 Iowa 196, and cases therein cited, but a careful reading of the Steffen case shows that the reason for the reversal was because the finger-print expert was asked to state the fact, instead of his belief, conclusion, opinion or best judgment. Neither the question asked nor the answer given in the instant case is analogous with those held improper in the Steffen case. We hold that the testimony of the witness Goddard is not vulnerable to the objections urged against it in appellant's assignments of error.

The next proposition urged by the appellant is the sustaining of the State's objection to his question propounded to the witness Goddard on cross-examination, as to how much the laboratory is to receive for his services as a witness in this case. In his assignments of error he also urges that the court did not permit the witness to answer as to how much he (the witness) is to receive for such service. This proposition is not borne out by the record, as it clearly shows that the court required the witness to answer in so far as he is personally to receive anything for said services. The witness answered that he is to receive no pay for his services. The appellant relies upon Buttman v. Christy, 197 Iowa 661; but since the answer of the witness is to the effect that he is to receive no pay for his services as a witness, said case is clearly not in point. We find no error at this point.

Appellant's next complaint is that the court improperly admitted in evidence the photographs of the two bullets without sufficient identification. While they were taken and developed by one Farrell, who was not a witness, Goddard testified that he set the bullets in position, and that said photographs were taken and developed under his direction, and the same were fully explained by him. There is no merit in appellant's contention at this point. See State v. Matheson, 142 Iowa 414.

Appellant's statements of error contain the following: "The court erred in giving to the jury Instruction No. 11." "The

court erred in overruling defendant's Motion for a new trial;" and a few others of the same general nature and no more specific. Under the rules of this court and our repeated pronouncements upon the subject, these present nothing for our consideration. See State v. Gill, 202 Iowa 242; State v. Briggs, 207 Iowa 221; Morrow v. Downing, 210 Iowa 1195; State v. Martin, 210 Iowa 376; State v. Cordaro, 206 Iowa 347; State v. White, 205 Iowa 373; State v. Gibson, 204 Iowa 1306; Blomgren v. City of Ottumwa, 209 Iowa 9. However, we have carefully examined the record to which the statements of error in such form refer, and find no error.

From a careful reading of the record, we are firmly convinced that the appellant has had a fair trial. We find no error. The judgment of the trial court is hereby affirmed.—Affirmed.

All Justices concur.