## HAMON MACKLIN v. STATE.

No. A-9336. Feb. 25, 1938.

(76 P. 2d 1091.)

B. C. Franklin, of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Holly L. Anderson, Co. Atty., of Tulsa, for the State.

BAREFOOT, J. The defendant was charged with the crime of murder in Tulsa county, was tried, convicted, and sentenced to serve a life term in the penitentiary, and has appealed.

At the outset of this case we are called upon to pass upon a motion to dismiss the appeal for the reason that no notice of appeal was served upon the county attorney and court clerk as required by law. The record as filed herein does not show that any written notice was served upon the county attorney or court clerk of an intention to appeal. Counsel for defendant, when served with the motion to dismiss this appeal, filed a response to which is attached an affidavit in which he states that he served a written notice of appeal on the assistant county attorney on the 24th day of November, 1936, three days after the motion for new trial was overruled, and that on the 1st day of May, 1937, he served a written notice upon the court clerk of Tulsa county of his intention to appeal from the judgment of the court overruling the motion for new trial November 21, 1936. He attaches to his response a copy of the notice which he claims to have served on the county attorney and the court clerk. No denial is made of these affidavits. Under Okla. Stats. 1931, § 535, Okla. St. Ann. tit. 12, § 959, p. 354, this court would have authority to return the case-made to the trial court for the purpose of having the same corrected to speak the truth as set out in said affidavit, but we find that this case had been briefed; that the defendant was given a life term; that he had no funds to employ a lawyer to defend him, and the court appointed counsel which the record shows received $10 for his services. Under these circumstances, we are of the opinion that the motion to dismiss the appeal in this case should be denied and the same should be considered on its merits.

It is contended by defendant that the court erred in permitting to be introduced certain evidence which was irrelevant, incompetent, and immaterial, and that the evidence was insufficient to sustain a conviction. It is disclosed by the record that the deceased, Walter Scott, a negro, was engaged in running a barbecue stand and beer garden at 311 North Greenwood street, in the city of Tulsa, on and before July 3, 1936. He lived at 311 East Easton, which was about three and a half blocks west of his place of business. On the night of July 2, 1936, the defendant, Hamon Macklin, who was also known as James Brown, was at this place of business on several different occasions. He was seen there by several parties and was dressed in striped bibbed overalls with another pair of pants under them, and having in his possession a black or blue steel revolver which he was brandishing at different times. When asked by one of the witnesses for the state about the gun, he said: "I always keep one of those for protection." He was seen there about 11:30 or 12 o'clock and again some time between 2:30 and 3 a. m., on the 3d day of July, 1936. The deceased left his place of business and started to his home about 2:30 or 3 a. m. He was shot to death and robbed in an alley near his home shortly after leaving his place of business. He was shot three times, one time in the head near the right ear, once in the neck, and once through the heart. The doctor testified that either of these shots would have produced death.

A girl by the name of Ophelia Hughes testified that she lived just across the street from where deceased lived, but on the night of the homicide she was staying at the home of Mrs. Bell with whom deceased lived; that she was sleeping in the northeast room upstairs near the alley, and about 10 or 12 feet from the ground or pavement; that about 4 o'clock a. m. she was awakened by the report of a gun in the alley which she at first thought was the firing of a firecracker. She went to the window and saw deceased lying on the ground with some fellow stooping over him; that she

got excited and ran into the front room of the house and when she came back deceased was still lying there and the fellow was going up the alley. She testified that she heard two shots after the first shot was fired. She could not identify the party whom she saw, and could not give an accurate description of him because it was too dark.

Soon after this happened the police came to make an investigation. The deceased's head was lying in the dirt just off the pavement. His pockets were turned wrong side out. Police Officers C. W. White and A. K. Goldman made the investigation. They were called at 4:09 a. m. These same officers, about 6 or 6:30, arrested the defendant in the 600 block on Archer street, just as he was entering the LaFayette Hotel. He was dressed in a light gray suit and white shirt. After arresting defendant, who was with a boy by the name of Hawkins, they went to the home of Arthur Bell, and from there to the home of Joe Carr. They secured from Joe Carr a .38 caliber S & W pistol, which they took to the police station, and which was afterwards turned over to Mr. Andrew Moore, ballistics expert for the police department.

Arthur Bell testified that the defendant came to his house between 5 and 6 o'clock on the morning of July 3, 1936, and while he was in bed; three other parties were with him, one being a boy by the name of Hawkins, and two others whom he did not know. The defendant said to the witness that he wanted to speak to him, and the witness replied, "Go ahead and tell me," and defendant said, "I want to get $2 on this gun," and witness said, "I haven't got any money," so that was all that was said. The defendant showed him the gun; it was a black or blue steel .38 caliber S & W, and the witness identified the gun introduced in evidence as the gun defendant had shown him upon this occasion.

Joe Carr testified that defendant, in company with other parties, whom he did not know, came to his house about

fifteen minutes to 6 o'clock on the morning of July 3, 1936; that defendant had a revolver and asked him to let him have 50 cents on it. He said he would be back later that day and get it. He let him have the money and took the gun and put it under his pillow and it was a black or blue steel .38 caliber S & W, and was the same gun he turned over to the officers a little later. He said the defendant was dressed in a gray suit.

Witnesses were offered on behalf of the state who had found a bullet imbedded about 14 inches in the ground at the spot that deceased's head was lying at the time he was found in the alley. This bullet was recovered on the 6th day of July, 1936, and was immediately turned over to the police department.

The state offered in evidence a witness, Andrew Moore, who qualified as a ballistics expert. The gun which was recovered from the witness Joe Carr by the police officers about 6 a. m., on the morning of July 3, 1936, was turned over to Mr. Moore about 9 a. m., on the morning of the 4th day of July, 1936, and the bullet found buried in the ground near where the body of deceased was found was turned over to him on July 6th.

It is contended that the court erred in permitting the witness, Andrew Moore, to testify as an expert witness. He testified that he had had four and a half years experience, and that he was now employed in the science laboratory of the police department of the city of Tulsa; that for several years he had a private laboratory; that he had made over 100 tests; that he had testified in 25 or 30 cases; that he had studied and made many tests involving the science of photography, and that his laboratory was equipped to test for blood; that he examined the gun introduced in evidence and turned over to him by the police department, this being the same gun that defendant had given to the witness, Joe Carr, and had also examined the bullet which was found in the ground where deceased had been shot, and also the

test bullets which were fired by the witness; that he applied chemical tests to the surface of the bullet of the "evidence" bullet to determine whether blood was present on the surface, and found a reaction which showed that blood was present. His examination of the gun showed that it had been recently fired. This was also testified to by the police officers. He found the bullet to be an all-lead bullet of .38 caliber, known as a "38 special," weight 158 grains, and in his opinion was of Remington make. He made photographs of the bullets and also of the comparison microscope used in making examinations, and they were introduced in evidence, together with the bullets, and are attached to the record now before this court. The jury were permitted to examine the bullets through the microscope. The tests were made by mounting the "evidence" bullet under one objective of a comparison microscope, and one "test" bullet under the other objective, and an examination made of their similarity under the comparison microscope which is designed for that purpose. His examination was as follows:

"Q. (By Mr. Anderson) Now then, continue with the examination of the witness. A. Now, in my examination of defendant's exhibit 1, or the evidence bullet, I searched for characteristic markings on the surface of that bullet which are peculiar to the gun from which it was fired, as distinguished from the markings which any .38 calibre Smith and Wesson gun would make. The markings that I mention are designated as secondary markings, or accidental markings. The primary markings or—or factory markings we might say are the number of rifling grooves that the bullet shows, the direction of the rifling as it exists on the bullet, and the size of those riflings. And then, above and beyond that, a search is made for striations or cuttings which are made on the soft surface of the bullet due to its passage through the barrel and being in contact under pressure with the steel surface of the barrel. Now, in this particular case I found parallel striations which are not produced by just any Smith and Wesson .38 calibre special revolver. Q. Just a minute. Will you point out on the photograph there what you mean by striations? A. Now, these are the ones that I am referring to, the two straight little marks as though

two little steel fingers are raked across it. Q. Those are secondary markings, are they? A. Yes, those are secondary markings, and accidental, and beyond the control of man, is what the condition is there. Q. All right, go ahead. A. The location of markings such as I have pointed out here are the key marks of identification. They are the guide which I used in searching for the same condition on test bullets. I know that the existence of those marks are accidental, and if I find them on one or more test bullets fired through a suspected gun that is indicative to me of similarity of origin of all the bullets, evidence bullets and test bullets. In this case when I located the marks I have mentioned I placed the bullet under the comparison microscope with those in the position where they would be most easily seen and then made a search on test bullets for markings located exactly the same. Q. Then your other photograph there is a comparison photograph? A. That is correct. After I had located one of the test bullets which showed similar markings I adjusted the instrument so that they would be in coincidence, so that they would just tally, the striations across the entire field. This photograph then is a comparison, the best comparison which I found, to use as a basis for an identification between the two bullets which I had under observation. This broader line right here, or this slotted condition, is due to the common markings of any revolver of this type, and are not, of course, particularly this gun. However, the area within the borders of the rifling grooves show the accidental characteristics which identify the two bullets as having been fired from the same, or from one gun, and that is what this photograph is, as near as I can explain it. Q. And it does show that? A. Yes, sir, it does show it."

On cross-examination the witness testified that in his study and preparation for his training as a ballistics expert he had studied Charles Gunther's text-book known as "Text Book of Small Arms," as prepared by the British War Office, and the material that Dr. Hounds Cross has written on the subject; also general papers and technical papers and various authorities; "Pistols and Revolvers," by Julian Hatcher; and the text-book known as "Recent Advances in Forensic Medicine," which contains a large portion on firearms examinations; "Science versus Crime," by Henry

Morton Robinson, and other authorities. The cross-examination revealed the same testimony as given on direct examination.

There were few decisions with reference to the introduction of expert testimony to identify the weapon from which a shot was fired until recent years, but the science of ballistics is now recognized as one of the best methods in ferreting out crime that could not otherwise be detected. Expert evidence to identify the weapon from which a shot was fired is generally admitted under the rules covering other forms of expert testimony, and it is the modern tendency of the courts to allow the introduction of such testimony, where the witness' preparation as shown by experience and training qualifies him to give expert opinion on firearms and ballistics tests. In our opinion the witness in this case showed such qualifications.

The recent case of William Evans v. Commonwealth, 230 Ky. 411, 19 S.W. 2d 1091, 1096, 66 A.L.R. 360, full and complete note page 373, gives a full, complete, and interesting discussion of this question and is very similar to the case at bar. The notes in 66 A.L.R. at page 373 cite the cases from many states in which this question is fully discussed. In the body of the opinion in the Evans Case, supra, the court says:

"Ordinarily a witness is said to testify as an expert when a state of facts, observed by some one else, is hypothetically submitted to the witness, and he is asked, in view of those facts, to state what his opinion is, whereas a man skilled in a particular business, who makes his own observations, and testifies to what he has observed and his conclusions therefrom is regarded as a skilled witness. He occupies the same position as any other witness, except that it is recognized that within certain lines he possesses a superior knowledge which enables him to understand, as one without such special knowledge could not, what he has observed."

We are of the opinion that the witness in the instant case showed himself qualified to testify as an expert on ballistics and the court did not err in permitting this evidence to be presented to the jury. Collins v. State, 15 Okla. Cr. 96, 175 P. 124; Commonwealth v. Best, 180 Mass. 492, 62 N.E. 748; State v. Boccadoro, 105 N.J.L. 352, 144 A. 612; Laney v. United States, 54 App. D.C. 56, 294 F. 412; State v. Casey, 108 Ore. 386, 213 P. 771, 217 P. 632; Pemberton v. State, 55 Tex. Cr. R. 464, 117 S. W. 837; State v. Vuckovich, 61 Mont. 480, 203 P. 491; People v. Weber, 149 Cal. 325, 86 P. 671; Galenis v. State, 198 Wis. 313, 223 N.W. 790.

The defendant, testifying in his own behalf, on direct examination said that he formerly stayed at the LaFayette Hotel, but that on the 2d and 3d of July, 1936, he was staying at a rooming house at 130 North Greenwood, which was operated by Maydell Love, and at which a friend of his, Elijah Brooks, was sick and he was staying with him; that he was in his room until about 15 minutes until 12 o'clock on the night of July 2d, at this time he went to get a glass of beer and went to the place of business of Walter Scott the deceased, and while there he stole a pistol that was laying on a table; that he returned to the room of Elijah Brooks about 12:30 o'clock and remained there until about 5 a. m.; that he had received a suit of clothes from the cleaner about 6:30 p. m.; and that he put on these clothes at that time and had worn them all the time, and had them on later when he was arrested. He denied having on a suit of bibbed overalls at any time during the evening. When he left his home at 5 a. m. on the 3d of July, 1936, he said it was for the purpose of going to Mr. Hunter's to get medicine for his friend, Elijah Brooks; that when he got on the streets he met a man by the name of McMurray, who asked him to go in his car for the purpose of getting a drink; that he had in his possession the .38 caliber S & W blue or black pistol which he had stolen from the place of business of the deceased, Walter Scott; that two other people

were in the car and that they drove to the home of Tommie Jones for the purpose of trying to pawn the pistol, and that he afterwards went to the home of Arthur Bell, and from there to the home of Joe Carr, who let him have 50 cents and took the pistol; that he then returned to the LaFayette Hotel and was arrested by the officers between 6 and 7 a. m. On cross-examination he admitted that he had been previously convicted and served two terms in the penitentiary. He admitted stealing the gun at the place of business of the deceased. He also admitted that he made no attempt to get the medicine, although he passed within a block of where Hunter lived. He admitted making two written statements to the officers after his arrest, one on July 3d and one on July 6th. The statement of July 3d was introduced as a part of his cross-examination. In this statement it was revealed that at that time he denied going to the home of Tommie Jones, Arthur Bell, and Joe Carr; denied that he had ever owned a pistol, or that he had offered to pawn one to Arthur Bell, and that he had turned a pistol over to Joe Carr. In this statement he also stated that he had left the room of Elijah Brooks about 10:30 p. m., on the night of July 2d, and did not return there again that night. The statement made on July 6th in many ways corroborated the statement made on July 3d. These statements and the statements that he made to the officers and others were in direct conflict with his testimony upon the issues that were very material in the trial of this case. One witness testified to seeing him leave the room of Elijah Brooks about 2:30 on the morning of the 3d of July, and at that time he was wearing striped bibbed overalls of the same description that witnesses testified he wore when at the place of business of the deceased at 10:30 p. m. and 2:30 a. m. the night of July 2d, and morning of July 3d. He also testified that at that time he had what he thought was a gun in the waist of his overalls.

From the above statement of the evidence, it will be seen that the jury who saw and heard the witnesses and

observed their demeanor on the witness stand were fully justified in returning the verdict of guilty against this defendant.

We have carefully examined the information, the instructions of the court, and find that defendant had a fair and impartial trial, and the judgment of the district court of Tulsa county is therefore affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.